STATE OF NORTH CAROLINA v. PRESTON TEION RAWLS, Defendant

No. COA09-1029

(Filed 19 October 2010)

**1. Identification of Defendants— showup—motion to suppress pretrial identification—Eyewitness Identification Reform Act inapplicable**

The trial court did not err in a felony breaking and entering case by denying defendant's motion to suppress the victim's pretrial identification of defendant based on its conclusion that the Eyewitness Identification Reform Act (EIRA) under N.C.G.S. § 15A-284.52 does not apply to showup identifications. The EIRA details procedural requirements officers must follow for a photo lineup or live lineup where a group of people are displayed to the eyewitness. In contrast, a showup is the showing of suspects singly to witnesses for purposes of identification.

**2. Identification of Defendants— showup—motion to suppress evidence—not unduly suggestive—no substantial likelihood of irreparable misidentification**

The trial court did not err in a felony breaking and entering case by denying defendant's motion to suppress evidence arising out of a showup. The showup procedure was not unduly suggestive,

**STATE v. RAWLS**

[207 N.C. App. 415 (2010)]

and a totality of circumstances test revealed that there was no substantial likelihood of irreparable misidentification. The victim had a meaningful opportunity to view the suspect face-to-face only a table's length away and was asked to identify him 10 to 15 minutes later.

**3. Appeal and Error— preservation of issues—failure to make timely objection**

Although defendant contended the trial court erred in a felony breaking and entering case by denying defendant's objection to the victim's in-court identification of defendant, this argument was not preserved for appeal under N.C. R. App. P. 10(b)(1). The untimely objection was not made until well after the question and answer, and defendant failed to argue plain error on appeal.

Appeal by defendant from judgment entered 8 April 2009 by Judge James E. Hardin, Jr. in Guilford County Superior Court. Heard in the Court of Appeals 14 January 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Chris Z. Sinha and Assistant Attorney General Kathleen N. Bolton, for the State.*

*Leslie C. Rawls for defendant-appellant.*

GEER, Judge.

Defendant Preston Teion Rawls appeals from his conviction of one count of felony breaking and entering. Defendant primarily argues that the trial court, when denying his motion to suppress the victim's pretrial identification, erroneously concluded that N.C. Gen. Stat. § 15A-284.52 (2009), the Eyewitness Identification Reform Act ("the EIRA"), does not apply to showup identifications. We agree with the trial court. After reviewing the EIRA as a whole, considering our courts' prior decisions distinguishing showups from lineups, and noting the fact that defendant's argument would effectively eliminate the use of showups, we are unwilling to hold that the General Assembly intended the EIRA to apply to showups in the absence of any express indication of that intent.

Facts

At trial, the State's evidence tended to show the following. On the morning of 29 September 2008, Linette Rochelle Pickard Smith finished working the third shift at her job and returned to her house. She had just gone to bed when, at approximately 10:30 a.m., she heard a loud

noise from another part of the house. She first checked her kitchen and, finding nothing out of the ordinary, then went to the living room.

There, she discovered that the back door had been kicked in and broken. She saw two men standing in the house and one man just outside the door. The man later identified as defendant was the closest one to Ms. Smith—he was about a table's length away. When Ms. Smith exclaimed, "[W]hat the hell," she and defendant "looked right dead at each other" and made eye contact. The men then fled. From her back yard, Ms. Smith could see them running toward a path that led to a nearby apartment complex. Ms. Smith went back inside and called the police.

Officer S.J. Langholz, a canine officer with the Greensboro Police Department, arrived about five minutes later with his canine, Jake. While Officer Langholz took Jake out of his vehicle, Ms. Smith reported that the "two black males that came in her house were wearing white tee shirts and khaki pants; the third one was wearing dark pants, possibly blue jeans and an unknown shirt." She also informed him that they had gone down the path toward the apartments.

Detective Eric Gray Miller was also in the area when he heard a radio broadcast with a partial description of the suspects. He started to drive toward Ms. Smith's house, but Officer Langholz advised him to go ahead to the apartment complex. As Detective Miller drove through the complex, he observed three men, in a breezeway, who fit the description he had heard on the radio. One of the men, defendant, was wearing light-colored warm-up pants and a hooded sweatshirt, another was wearing a white tee shirt and khakis, and the third man was wearing a white tee shirt and blue jeans. Detective Miller radioed for assistance. As he pulled up, the man in the white tee shirt and khakis began to walk away, but Detective Miller got out of the car and called him back over.

Meanwhile, Jake had begun to track from Ms. Smith's backyard, leading Officer Langholz down the path to the apartment complex. Jake tracked up to the second or third building until they came upon a blue duffel bag that Jake picked up and shook. Jake then dropped the bag and walked around the corner of the building into a breezeway and began barking. This breezeway was where Detective Miller and other officers were waiting with the three subjects.

Officer Miranda Key Lone was one of the officers who went to the apartment complex to assist Detective Miller. Once she arrived, she was directed to Ms. Smith's house to see if Ms. Smith would be willing to do a showup identification of the suspects. Officer Lone told Ms. Smith,

STATE v. RAWLS

[207 N.C. App. 415 (2010)]

"[T]hey think they found the guy[,]" and Ms. Smith agreed to the showup. Officer Lone then took Ms. Smith and her husband in the patrol car to the apartment complex, about a 45-second drive.

From the car, Ms. Smith was unable to get a good view of the three detained individuals, so she got out of the car and walked up the stairs to where they were sitting. Recognizing the men's clothing and defendant's face, she identified all three as the men who had been at her house. She "pointed them out" individually, saying "that was him, the first one; and this is the second one, and that's the third one." Ms. Smith indicated that the first two men, including defendant, were the ones inside the living room, but she was unsure if the third man had actually entered the house. When Detective Miller asked Ms. Smith if she was sure about the identifications, she replied that "she was positive, and that she could not forget their faces."

Defendant was subsequently indicted on the charge of breaking and entering.[1] On 6 April 2009, defendant filed a motion to suppress any evidence related to the showup, as well as any in–court identification of defendant, on the grounds that the showup was impermissibly suggestive and violated the EIRA. Defendant also contended that "any in-court identification is, in and of itself, a suggestive identification procedure." The trial court ruled that the EIRA does not apply to showups and denied defendant's motion to suppress.

The jury found defendant guilty of breaking and entering, and the trial court sentenced him to a presumptive-range term of eight to 10 months imprisonment. The court suspended the sentence and placed defendant on supervised probation for 36 months. Defendant timely appealed to this Court.

I

[1] Defendant first argues that the trial court erred in ruling that the EIRA does not apply to showups. The purpose of the EIRA "is to help solve crime, convict the guilty, and exonerate the innocent in criminal proceedings by improving procedures for eyewitness identification of suspects." N.C. Gen. Stat. § 15A-284.51 (2009). The EIRA details several procedural requirements that law enforcement officers must follow when conducting a "lineup," which the EIRA defines as a "photo lineup or live lineup." N.C. Gen. Stat. § 15A-284.52(a)(4).

---

1. Although it appears from the transcript of the proceedings that defendant was also indicted for attempted larceny pursuant to breaking and entering, injury to real property, and felony conspiracy, those indictments are not included in the record on appeal.

STATE v. RAWLS

[207 N.C. App. 415 (2010)]

As our Supreme Court has emphasized, when construing a statute, "our primary task is to ensure that the purpose of the legislature, the legislative intent, is accomplished." *Elec. Supply Co. of Durham, Inc. v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991). In performing this function, "[l]egislative purpose is first ascertained from the plain words of the statute." *Id. See also O & M Indus. v. Smith Eng'g Co.*, 360 N.C. 263, 267-68, 624 S.E.2d 345, 348 (2006) ("The first consideration in determining legislative intent is the words chosen by the legislature."). When the words are unambiguous, "they are to be given their plain and ordinary meanings." *Id.* at 268, 624 S.E.2d at 348. When, however, the words are ambiguous, "judicial construction must be used to ascertain the legislative will." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 136-37 (1990).

The question presented by this appeal is whether the "lineup" referenced in the EIRA encompasses a "showup." Since there is no dispute that a showup is not a "photo lineup," the question is whether a showup falls within the definition of a "live lineup." "If a statute 'contains a definition of a word used therein, that definition controls,' but nothing else appearing, 'words must be given their common and ordinary meaning[.]' " *Knight Publ'g Co. v. Charlotte-Mecklenburg Hosp. Auth.*, 172 N.C. App. 486, 492, 616 S.E.2d 602, 607 (quoting *In re Clayton-Marcus Co.*, 286 N.C. 215, 219, 210 S.E.2d 199, 203 (1974)), *disc. review denied*, 360 N.C. 176, 626 S.E.2d 299 (2005). Further, " '[w]ords and phrases of a statute may not be interpreted out of context, but individual expressions must be construed as a part of the composite whole and must be accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit.' " *In re Expungement of Spencer*, 140 N.C. App. 776, 779, 538 S.E.2d 236, 238 (2000) (quoting *In re Hardy*, 294 N.C. 90, 95-96, 240 S.E.2d 367, 371-72 (1978)).

The EIRA defines a "live lineup" as "[a] procedure in which a group of people is displayed to an eyewitness for the purpose of determining if the eyewitness is able to identify the perpetrator of a crime." N.C. Gen. Stat. § 15A-284.52(a)(6). A showup, by contrast, is "the practice of showing suspects singly to witnesses for purposes of identification." *State v. Turner*, 305 N.C. 356, 364, 289 S.E.2d 368, 373 (1982) (defining "showup"). There is no dispute that the procedure at issue in this case was a showup—Ms. Smith was shown three men and asked if they were the three men at her house. Although defendant acknowledges that not all showups would fit within the definition of a "live lineup," defendant

argues that what occurred in this case fits within the definition of a live lineup because Ms. Smith was shown a group of people.

The plain language of the definition leaves open the question whether the "group" is supposed to include only one perpetrator or whether the reference to a "group" encompasses the situation here when multiple suspects are present in the group observed by the witness in a context other than a formal lineup. Reading the statute as a whole, however, "live lineup" cannot reasonably be construed to encompass a showup such as the one that occurred here.

The EIRA provides that a single live lineup may contain no more than one suspect, and must also contain at least five "fillers"—people who are included in the lineup but are "not suspected of an offense." N.C. Gen. Stat. § 15A-284.52(a)(2),-(b)(5)(c), -(b)(10). "The lineup shall be composed so that the fillers generally resemble the eyewitness's description of the perpetrator, while ensuring that the suspect does not unduly stand out from the fillers." N.C. Gen. Stat. § 15A-284.52(b)(5). Additionally, "[a]ll fillers selected shall resemble, as much as practicable, the eyewitness's description of the perpetrator in significant features, including any unique or unusual features." N.C. Gen. Stat. § 15A-284.52(b)(5)(a).

These provisions demonstrate that the live lineup's "group" is not intended to include a group of suspects located by officers while investigating a crime, but rather is a group of individuals brought together for the purpose of the lineup. *See* Sarah Anne Mourer, "Reforming Eyewitness Identification Procedures Under the Fourth Amendment," 3 Duke J. Const. L. & Pub. Pol'y 49, 90 n.137 (2008) ("A show-up identification is characterized by the witness being presented with only one suspect for possible identification; no fillers are included.").

The EIRA further provides that a live lineup must be "conducted by an independent administrator," who is defined as someone "not participating in the investigation of the criminal offense and is unaware of which person in the lineup is the suspect." N.C. Gen. Stat. § 15A-284.52(a)(3), -(b)(1). Before a lineup begins, the eyewitness must be instructed that, *inter alia*, "[t]he perpetrator might or might not be presented in the lineup," and "[t]he lineup administrator does not know the suspect's identity." N.C. Gen. Stat. § 15A-284.52(b)(3)(a), -(b)(3)(b).

It is difficult to reconcile the concept of a showup with the requirement of an administrator who is not participating in the investigation of the crime. Showups are typically "defined as a procedure where the police take a witness, shortly after the commission of an observed

crime, to where the police are detaining the suspect, in order to give them an opportunity to make an identification." *Smith v. State*, 880 So.2d 730, 739 n.2 (Fla. App. 2004) (internal quotation marks omitted). Indeed, our Supreme Court has observed that "[s]howups are an efficient technique for identifying a perpetrator when the [crime] is still fresh." *In re Stallings*, 318 N.C. 565, 569, 350 S.E.2d 327, 329 (1986).

Viewing the EIRA as a whole, we agree with the trial court that the EIRA does not apply to showups because the procedure of a live lineup is inherently inconsistent with the definition of a showup. Most importantly, there are no fillers in a showup—only suspects. In addition, the person setting up a showup would typically not be an independent administrator but would likely either have spoken to the witness or have been involved in detaining the suspect or suspects.

Our Supreme Court has also expressly distinguished between showups and lineups. *See, e.g., State v. Richardson*, 328 N.C. 505, 510, 402 S.E.2d 401, 404 (1991) (referring to showup as " 'practice of showing suspects singly to persons for the purpose of identification, and *not as part of a lineup*' " (emphasis added) (quoting *State v. Oliver*, 302 N.C. 28, 44, 274 S.E.2d 183, 194 (1981))); *Stallings*, 318 N.C. at 570, 350 S.E.2d at 329 (explaining that for juvenile defendant, lineup is "method[] that intrude[s] significantly upon the juvenile's privacy," but "showup, *by contrast*, is a much less restrictive means of determining, at the earliest stages of the investigation process, whether a suspect is indeed the perpetrator of a crime" (emphasis added)).

Black's Law Dictionary differentiates the terms as well, defining a showup as a "pretrial identification procedure in which a suspect is confronted with a witness to or the victim of a crime" and further explaining that "*[u]nlike a lineup*, a showup is a one-on-one confrontation. Cf. LINEUP." *Black's Law Dictionary* 1506 (9th ed. 2009) (emphasis added). Even defendant acknowledges that "[t]raditionally, show-ups, like the one in this case, have been distinguished from lineups."

It is well established that the legislature is " 'presume[d] [to have] acted with full knowledge of prior and existing law and its construction by the courts.' " *State v. Anthony*, 351 N.C. 611, 618, 528 S.E.2d 321, 324 (2000) (quoting *State ex rel. Cobey v. Simpson*, 333 N.C. 81, 90, 423 S.E.2d 759, 763 (1992)). Given that the legislature is presumed to be fully aware of our courts' prior distinctions between lineups and showups and given that, in the face of this precedent, the legislature did not reference showups in the EIRA, it is unlikely that the legislature intended the word "lineup" to encompass a "showup."

Moreover, if we were to accept defendant's argument that the EIRA applies to showups, showups would effectively be eliminated. Our Supreme Court has previously concluded that a statute should not be construed in a way that would eliminate showups in the absence of an express statement by the legislature of its intent to do so. In *Stallings*, 318 N.C. at 568, 350 S.E.2d at 328, the Supreme Court considered a similar argument involving a statute in the Juvenile Code that required investigators dealing with juvenile suspects to obtain a court order before conducting certain " 'nontestimonial identification' " procedures, including lineups. Although the statute, like the EIRA, did not mention showups, the juvenile argued that the reference to "lineups" should be construed to include "showups," thus making a court order a prerequisite for a showup.

The *Stallings* Court noted, in its analysis, that "[t]he value of the showup as an investigatory technique has been recognized in many jurisdictions" and that our Supreme Court had "on numerous occasions, sanctioned the use of showups." *Id.* at 569, 350 S.E.2d at 329. It further pointed out that "[t]he showup . . . is a much less restrictive means of determining, at the earliest stages of the investigation process, whether a suspect is indeed the perpetrator of a crime[,]" allowing an innocent person to be "released with little delay and with minimal involvement with the criminal justice system." *Id.* at 570, 350 S.E.2d at 329.

It then concluded that making showups subject to the statute, although not specifically referenced in the statute, would not be consistent with the legislature's intent:

> If we were to adopt the reasoning and argument advanced by the juvenile here, it would mean that if an officer reached a crime scene immediately upon the happening of a break-in and found the juvenile perpetrator huddled under the porch of the house he had just fled, the officer could not ask the eyewitness homeowner if the juvenile was the one who the homeowner had just seen inside the house. Such a result would be absurd and could not have been intended by our legislature in enacting N.C.G.S. §. 7A-596. The juvenile's reading of the statute would effectively eliminate the showup from the repertoire of investigative techniques available to law enforcement officers. We hold that the legislature did not intend this result.

*Id.* at 570-71, 350 S.E.2d at 329-30.

We hold that the reasoning in *Stallings* controls in this case. We must presume that the General Assembly was familiar with *Stallings* when it enacted the EIRA—accordingly, it knew that it needed to specifically reference showups in the EIRA if it intended them to be covered by the EIRA. Yet, it did not do so. Given (1) that the provisions of the statute are inconsistent with the methodology of a showup, (2) that application of the EIRA to showups would effectively eliminate showups as an investigative technique, and (3) that showups, although sometimes troubling, may also, in some circumstances, lead to elimination of innocent individuals from investigation at an early stage, we are unwilling to conclude that the General Assembly intended that showups be subject to the requirements of the EIRA. The trial court, therefore, did not err in concluding that the EIRA did not apply to the showup in this case.

## II

[2] Alternatively, defendant contends that the trial court erred in denying his motion to suppress evidence arising out of the showup because the showup procedure was impermissibly suggestive. Our courts apply "a two-step process for determining whether an identification procedure was so suggestive as to create a substantial likelihood of irreparable misidentification." *State v. Marsh*, 187 N.C. App. 235, 239, 652 S.E.2d 744, 746 (2007), *overruled on other grounds by State v. Tanner*, 364 N.C. 229, 695 S.E.2d 97 (2010). " 'First, the Court must determine whether the identification procedures were impermissibly suggestive. Second, if the procedures were impermissibly suggestive, the Court must then determine whether the procedures created a substantial likelihood of irreparable misidentification.' " *Id.* (quoting *State v. Fowler*, 353 N.C. 599, 617, 548 S.E.2d 684, 698 (2001), *cert. denied*, 535 U.S. 939, 152 L. Ed. 2d 230, 122 S. Ct. 1322 (2002)). Even though they may be "suggestive and unnecessary," showups "are not *per se* violative of a defendant's due process rights." *Turner*, 305 N.C. at 364, 289 S.E.2d at 373.

Here, before Ms. Smith was taken to the apartments for the showup, Officer Lone explained to her what a showup is and told her, "[T]hey think they found the guy." By the time Ms. Smith arrived at the apartments and saw defendant, he was detained and sitting down, and "[t]here were several officers around."

This showup procedure is analogous to the one reviewed in *Richardson*, 328 N.C. at 511, 402 S.E.2d at 405. In *Richardson*, three

witnesses identified the defendant as the man they had seen at their workplace a few hours earlier. *Id.* During the identification, the defendant "*was sitting alone or with uniformed personnel in the security office at the hospital*" and "investigating officers told [two of] the witnesses defendant was a suspect" before those witnesses saw him. *Id.* The Supreme Court determined that "[t]he identification procedures the officers chose, coupled with their statements to two of the three witnesses that 'they had a suspect,' were unduly suggestive." *Id. See also Oliver,* 302 N.C. at 45, 274 S.E.2d at 194 (holding showup procedure unduly suggestive when coupled with statement by officers to witness that he would have chance, at police station, to see again man who attacked his grandfather).

*Richardson* and *Oliver* are materially indistinguishable from this case. We, therefore, conclude that the showup procedure used here was unduly suggestive. Nevertheless, even though the showup was impermissibly suggestive, we find that there was no substantial likelihood of irreparable misidentification.

When evaluating whether such a likelihood exists, courts apply a totality of the circumstances test. *State v. Smith,* 134 N.C. App. 123, 127, 516 S.E.2d 902, 905-06 (1999). "For both in-court and out-of-court identifications, there are five factors to consider in determining whether an identification procedure is so inherently unreliable that the evidence must be excluded from trial: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." *State v. Washington,* 192 N.C. App. 277, 296-97, 665 S.E.2d 799, 811 (2008). " 'Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' " *Turner,* 305 N.C. at 365, 289 S.E.2d at 374 (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253 (1977)).

Applying these factors, while Ms. Smith only viewed the suspects for a short time, she looked "dead at" the suspect she later identified as defendant and made eye contact with him from only a table's length away. It was approximately 10:30 in the morning, and nothing was obstructing her view. The showup occurred only 15 minutes later, and Ms. Smith was "positive" about the identifications of the three suspects, as "*she could not forget their faces.*"

These facts when weighed against the suggestiveness of the showup are sufficient to support the determination that there was no substantial likelihood of irreparable misidentification. *See Richardson*, 328 N.C. at 511, 402 S.E.2d at 405 (finding no substantial likelihood of misidentification when witness saw suspect "for about three to four seconds after her suspicions were aroused," "[h]er description matched that of other witnesses," showup occurred only about 45 minutes after witness originally saw suspect, and "she was unequivocal in her identification"); *State v. Cain*, 79 N.C. App. 35, 45, 338 S.E.2d 898, 904 (finding no substantial likelihood of misidentification when witness observed suspect "for 5-10 seconds from a distance of 15-20 feet" and later "identified the defendant as the man he saw, having no doubt in his mind"), *disc. review denied*, 316 N.C. 380, 342 S.E.2d 899 (1986).

Defendant points to the fact that his clothing did not fit the description of the intruders given by Ms. Smith. When defendant was detained, he was wearing a hooded sweatshirt and light-colored jogging pants rather than the khakis and white tee shirt Ms. Smith had reported. Similarly, in *Richardson*, 328 N.C. at 511-12, 402 S.E.2d at 405, one of the witnesses "described . . . what defendant had been wearing when he saw him earlier," but the defendant "was clothed differently by [the] time" of the identification. Nonetheless, the Court held that considering the totality of the circumstances, particularly that the witness was "certain in his identification," the trial court did not err in admitting the out-of-court identification. *Id.* at 512, 402 S.E.2d at 405.

Here, although the discrepancy between Ms. Smith's description and defendant's attire detracts from the reliability of the identification, other factors—including her certainty, her ability to view him directly from a short distance, and the short window between the crime and the identification—substantially bolster it. In addition, one of the men with defendant, the second man identified as being in the house, *was* wearing a white tee shirt and khakis as described by Ms. Smith.

Defendant's reliance on *State v. Miller*, 270 N.C. 726, 154 S.E.2d 902 (1967), is misplaced. As the Supreme Court has explained, "*Miller* stands for the proposition that while the question of whether the identification testimony of the prosecuting witness has any probative value is for the jury to decide, the rule has no application where the *only* evidence which tends to identify a defendant as the perpetrator of the offense is inherently incredible because of undisputed facts clearly established by the state's evidence." *State v. Royal*, 300 N.C. 515, 524, 268 S.E.2d 517, 524 (1980) (emphasis added).

Miller, on the other hand, "has no application . . . where there is a reasonable opportunity of observation which is sufficient to permit a subsequent identification." *Royal*, 300 N.C. at 525, 268 S.E.2d at 524. In *Miller*, the witness observed a man, someone he had never seen before, in the evening from a distance of no less than 286 feet. 270 N.C. at 732, 154 S.E.2d at 905. The man was running except for one time when he turned around to " 'peep' " at the witness. *Id.* The description that the witness gave the police was of a man substantially taller than the defendant; otherwise, the witness could only say that the man was dressed in dark clothing. *Id.* Six hours later, the witness identified the defendant in a lineup "so arranged that the identification of [the defendant] with the man seen earlier would naturally be suggested to the witness." *Id.*

Although the Court held in *Miller* that "upon the physical conditions shown [there] by the State's evidence," the identification was not sufficient to send the case to the jury, the Court emphasized that "[w]here there is a reasonable possibility of observation sufficient to permit subsequent identification, the credibility of the witness' identification of the defendant is for the jury . . . ." *Id.*, 154 S.E.2d at 906. Here, in contrast to *Miller*, Ms. Smith had a meaningful, if brief, opportunity to view the suspect face to face only a table's length away and was asked to identify him a mere 10 to 15 minutes later. We hold that under the circumstances in this case, Ms. Smith had the opportunity for observation required by *Miller* and, therefore, *Miller* did not require the exclusion of her identification.

In sum, weighing the *Washington* factors against the suggestiveness of the showup procedure, we conclude that there was not a substantial likelihood of irreparable misidentification in this case. The trial court, therefore, did not err in denying defendant's motion to suppress.

III

**[3]** Lastly, defendant argues that the court erred in overruling his objection to Ms. Smith's in-court identification of defendant. Defendant failed, however, to timely object to the in-court identification.

At trial, during Ms. Smith's direct examination, she identified defendant as the person who had broken into her house:

A.    . . . So I went to my living room area. That's when I seen the defendant. I don't know if I can say the name, but another person behind him, and then another person behind him. We looked right dead at each other.

Q. When you say "we looked at each other," who are you referring to?

A. Me and the defendant.

Q. What is the defendant's name?

A. Preston.

Q. When you refer to "Preston," can you point to him in the courtroom, please.

A. Yes, he has on an orange shirt (indicating).

Defendant made no objection to this identification at the time.

Later, when the examination addressed the showup, defendant finally objected to Ms. Smith's in-court identification. The trial court, in overruling the objection, pointed out that Ms. Smith "already identified the defendant in court as having been in her house, and there was no objection." Defendant acknowledged, "I understand that, Your Honor."

Rule 10 of the Rules of Appellate Procedure "provides that '[i]n order to preserve a question for appellate review, a party must have presented to the trial court a *timely* request, objection or motion, stating the specific grounds for the ruling the party desired the court to make.' " *Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 195, 657 S.E.2d 361, 363 (2008) (emphasis added) (quoting N.C.R. App. P. 10(b)(1)). Defendant's objection, not made until well after the question and answer, was not timely and, therefore, was insufficient to preserve the issue for appeal.

Defendant does not argue plain error on appeal, and, therefore, whether admission of the identification amounted to plain error is not before us. *See State v. Bell*, 359 N.C. 1, 27, 603 S.E.2d 93, 111 (2004) ("Defendant failed to specifically assert plain error. He therefore failed to properly preserve this issue for appellate review."), *cert. denied*, 544 U.S. 1052, 161 L. Ed. 2d 1094, 125 S. Ct. 2299 (2005); *State v. Williams*, 153 N.C. App. 192, 195-96, 568 S.E.2d 890, 892-93 (holding issue not reviewable by Court when defendant failed to preserve error at trial and did not specifically and distinctly assert plain error in appellate brief), *disc. review improvidently allowed*, 357 N.C. 45, 577 S.E.2d 618 (2003).

No error.

Judges CALABRIA and STEPHENS concur.