NO. COA14-122

NORTH CAROLINA COURT OF APPEALS

Filed: 2 September 2014

STATE OF NORTH CAROLINA

    v.

DONTE MACON,
    Defendant.

Vance County
No. 12CRS052725-26

Appeal by defendant from Judgment entered on or about 10 July 2013 by Judge Henry W. Hight, Jr. in Superior Court, Vance County. Heard in the Court of Appeals 12 August 2014.

> *Attorney General Roy A. Cooper, III, by Assistant Attorney General Jonathan Shaw, for the State.*

> *Wait Law, P.L.L.C., by John L. Wait, for defendant-appellant.*

STROUD, Judge.

Donte Macon ("defendant") appeals from the judgment entered after a Vance County jury found him guilty of carrying a concealed weapon and possession of a firearm by a felon. Defendant argues that the trial court erred in admitting in-court identifications by two police officers whose testimony was tainted by impermissibly suggestive out-of-court identification procedures. We hold that the trial court did not err by admitting the in-court identifications.

## I. Background

On 8 October 2012, defendant was indicted for carrying a concealed weapon and possession of a firearm by a felon. Defendant pled not guilty. Before trial, defendant moved to suppress both the in-court and out-of-court identifications of him by Officer D.L. Ragland and Sergeant J. Ragland. He argued that the officers violated the Eyewitness Identification Reform Act (EIRA) and his constitutional rights by viewing only a single photograph to identify defendant as the perpetrator.

By order entered 11 July 2013, the trial court denied defendant's motion to suppress. Based on the uncontested findings of fact, around noon on a sunny 31 August 2012, Officer Darryl Ragland and Sergeant Jamie Ragland of the Henderson Police Department were on patrol when they saw a green Honda parked behind a convenience store. When they returned to the convenience store thirty minutes later, the same green Honda was still parked in the same location. Based on their experience with drug transactions in this area, they suspected that the occupants were engaging in the sale of heroin, so they approached the vehicle to make an investigatory stop. They saw one person sitting on the driver's side of the Honda when a person with dreadlocks got into the passenger's side. As the

officers approached, the Honda pulled off, drove a short distance, then stopped. The passenger got out of the Honda and looked directly at Officer Ragland. Officer Ragland had an unobstructed view of the passenger's face from about 10 feet away. He noticed that the passenger was a light-skinned black male with long dreadlocks and green eyes. The passenger took off running, so Officer Ragland followed him. Officer Ragland asked the passenger to stop, but he refused. During the pursuit, the passenger discarded an object before jumping over a fence.

Sergeant Ragland noticed that the passenger was running away but did not initially get a good look at him. Sergeant Ragland got back into his police car to try to cut off the fleeing passenger. As the passenger jumped over a fence, Sergeant Ragland saw him from about 5 to 7 yards away. He had an unobstructed view of the fleeing man, who then climbed another fence and escaped. The officers could not catch him.

Two more officers arrived on scene, including Officer Burrell. Officer Ragland told Officer Burrell what he had seen and described the passenger. Officer Burrell said that the person he described "sounds like Donte Macon." Officer Ragland and Sgt. Ragland then returned to the Henderson Police Department and entered the name "Donte Macon" into their RMS

database. When the system returned a photograph of defendant, Sgt. Ragland said, "That's him." Both Officer Ragland and Sergeant Ragland recognized the person in the photograph as the passenger who fled from the green Honda. The officers then pulled up another photograph of defendant and confirmed that he was the man they saw earlier. At the hearing, both officers "identified the defendant in open Court as the person they saw on August 31, 2012 with 100% certainty."

Based on these facts, the trial court concluded that the EIRA did not apply here and that the procedure used to identify defendant was not unduly suggestive. The trial court further concluded that the in-court identifications made by both officers were "of independent origin" from the procedure used to identify defendant. Therefore, the trial court denied defendant's motion to suppress.

At trial, the State's evidence tended to show the facts as found by the trial court. Additionally, Officer Ragland testified that he looked on the ground where defendant had discarded the object during the chase and found a small caliber handgun. Officer Ragland picked it up with a leaf and brought it back to the police department's evidence locker.  Both officers testified, over objection, that defendant was the person they

saw fleeing on 31 August 2012. The police tested the recovered firearm for fingerprints, but were unable to find any prints sufficient for testing. The State also introduced evidence of defendant's prior felony conviction.

After the State rested its case-in-chief, defendant testified on his own behalf. He denied that he was at the convenience store on 31 August 2012 and denied possessing a firearm of any kind. He testified that on the day in question he was with his "baby's mother" at her house in Henderson. Defendant stated that he was aware that, as a felon, he was not allowed to possess firearms, so he stayed away from them.

The jury found defendant guilty of both charges. The trial court sentenced defendant to 14-26 months imprisonment. Defendant gave notice of appeal in open court.

## II. Motion to Suppress

Defendant argues that the trial court erred in denying his motion to suppress the in-court identifications made by the officers because the procedure they used to identify him violated the EIRA and his constitutional due process rights. We disagree.

A. Standard of Review

"This Court's review of a trial court's denial of a motion to suppress in a criminal proceeding is strictly limited to a determination of whether the court's findings are supported by competent evidence, even if the evidence is conflicting, and in turn, whether those findings support the court's conclusions of law." *State v. Boozer*, 210 N.C. App. 371, 378, 707 S.E.2d 756, 763 (2011) (citation and quotation marks omitted), *disc. rev. denied*, ___ N.C. ___, 720 S.E.2d 667 (2012). "However, when, as here, the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal." *State v. Robinson*, ___ N.C. App. ___, ___, 727 S.E.2d 712, 715 (2012) (citation and quotation marks omitted). We review questions of statutory interpretation *de novo*. *Johnson v. Robertson*, ___ N.C. App. ___, ___, 742 S.E.2d 603, 605 (2013).

B. North Carolina Eyewitness Identification Reform Act

Defendant argues that the police failed to abide by the lineup procedures required by the EIRA, codified at N.C. Gen. Stat. § 15A-284.52 (2011). The State counters, and the trial court concluded, that the EIRA does not apply here. At the hearing on defendant's motion to suppress, the State argued that the EIRA did not apply because the use of a single photograph to

identify a suspect is not a "photo lineup," and that, furthermore, it does not apply to identifications made by police officers in the course of their investigation. We agree that the identification based on two photographs here was not a "lineup" and, therefore, was not subject to the procedures outlined in the EIRA.

The trial court made the following findings of fact, none of which are challenged by defendant:

> 6. That on August 31, 2012 Detective Darryl L. Ragland and Sgt. Jamie Ragland were on routine patrol as police officers with the City of Henderson Police Department assigned to the narcotics unit.
>
> 7. That Darryl Ragland has been employed with the Henderson Police Department for 3 years and seven months and was so employed on August 31, 2012.
>
> 8. That Jamie Ragland was employed with the City of Henderson Police Department for 21 years and was so employed August 31, 2012.
>
> 9. That as the officers were driving an unmarked police vehicle in the City of Henderson on August 31, 2012, they noticed a green Honda motor vehicle with a person on the driver's side parked behind Alex Market Store at the corner of Maple Street and Nicholas Street in Henderson.
>
> 10. That as the officers continued on patrol they drove by the Alex Market and noticed that the green Honda remained parked

behind the market for a period of thirty minutes.

11. That this was suggestive of drug activity (sale of heroin) to the officers.

12. That the officers drove up behind the green Honda to initiate an investigative stop.

13. That it was approximately 12 noon with bright sunlight when the officers drove up behind the Honda.

14. That the officers viewed a person enter the passenger side of the Honda.

15. That there was a person sitting on the driver['s] side[] of the green Honda.

16. That Officer D. L. Ragland and Sgt. Ragland noted that the person getting into the Honda had dread locks.

17. That the Honda pulled off as the officers approached, went a short way and then stopped.

18. That the passenger got out of the Honda.

19. That Officer Darryl Ragland got out of the unmarked police vehicle.

20. That the passenger then looked directly at Officer Ragland.

21. That at this point, Officer Darryl Ragland had an unobstructed view of the passenger and most specifically the passenger's face.

22. That Officer Darryl Ragland was 10 feet from the passenger when he saw his face.

23. That from this face to face between Officer D. L. Ragland and the passenger, Officer[] Ragland noticed that the passenger was an African-American male, light skinned, long dreads and green eyes.

24. That Officer Darryl Ragland did not know the passenger before this time.

25. That the passenger began running.

26. That Officer Darryl Ragland asked the fleeing man to stop.

27. That Officer Darryl Ragland pursued the fleeing man who did not stop.

28. That during the pursuit, Officer D. L. Ragland saw the fleeing man discard an object before he jumped over a fence.

29. That Officer D. L. Ragland stopped his pursuit and discovered a small caliber handgun which had been discarded by the fleeing passenger.

30. That until the passenger ran, Sgt. James J. "Jamie" Ragland saw no interaction between Officer Darryl Ragland and the exiting passenger as he focused on the person on the driver's side of the green Honda.

31. That at the point in time when Sgt. Ragland noticed that Officer Darryl Ragland began to chase the fleeing passenger, Sgt. Ragland noted only that the passenger was an African-American male with light skin and dreads.

32. That Sgt. Ragland tried to follow the chase by car in hopes of being able to cut off the fleeing passenger.

33. That as Sgt. Ragland drove he could see the chase behind houses that faced Nicholas Street.

34. That Sgt. Ragland saw that the fleeing passenger was coming upon a fence and drove his car behind a house in an effort to apprehend the passenger.

35. That as the passenger came over a fence . . . he turned around.

36. That Sgt. Ragland had a clear unobstructed view of the fleeing passenger who looked straight at him.

37. That Sgt. Ragland was about 5 to 7 yards from the fleeing passenger.

38. That Sgt. Ragland noted that the fleeing passenger was an African-American male with light skin and dreads.

39. That the fleeing passenger was able to climb another fence and escaped.

40. That other Henderson Police Officers Sgt. Collier and Officer Burrell arrived on the scene.

41. That Officer D. L. Ragland reported to Sgt. Collier and Officer Burrell what had occurred together with a description of the person who fled.

42. That Officer Burrell said that he sounds like Donte Macon.

43. That both Sgt. Ragland and Detective Ragland went directly to the Henderson Police Department and entered the name of Donte Macon into the automated RMS system.

44. That when a photograph of Donte Macon was pulled up on the screen, Sgt. Ragland said "That's him."

45. That both Detective Ragland and Sgt. Ragland immediately recognized that the person in the photo was the same person who fled from Alex's Market.

46. That this identification occurred within 10 to 15 minutes of the encounter with the fleeing passenger at Alex's Market.

47. That another photo of Donte Macon was provided by the RMS system.

48. That this photo of Donte Macon was also identified by both Officers as the person who fled from Alex's Market.

49. That D. L. Ragland identified the defendant, Donte Macon, as the person who fled the area behind Alex's Market, as the person who he chased and as the person who discarded a handgun on August 31, 2012.

50. That Jamie Ragland identified the defendant, Donte Macon, as the person he saw coming over a fence and who escaped on August 31, 2012.

51. That both Officer Ragland and Sgt. Ragland identified the defendant in open Court as the person they saw on August 31, 2012 with 100% certainty.

In general, out-of-court eyewitness identifications can be classified as "lineups," "photographic identifications," or "showups." *See generally*, Wayne R. LaFave, et. al., *Criminal Procedure* §§ 7.4(d), (e), (f) (3d ed. 2007). Other commentators

distinguish between three types of out-of-court identifications: live lineups, photo lineups, and showups. *See* Robert L. Farb, Arrest, Search , and Investigation in North Carolina 558 (4th ed. 2011). The EIRA defines a lineup as either a live lineup or a photo lineup. N.C. Gen. Stat. § 15A-284.52(a). Both types of lineups under the EIRA are defined by the use of a number of subjects—one suspect and several "fillers." The statute defines "photo lineup" as "[a] procedure in which an array of photographs is displayed to an eyewitness for the purpose of determining if the eyewitness is able to identify the perpetrator of a crime." N.C. Gen. Stat. § 15A-284.52(a)(7). It requires lineups to be conducted by an independent administrator and specifies the procedure for picking the fillers, among a number of other quite specific procedures for administering the lineup. N.C. Gen. Stat. § 15A-284.52(b).

Interpreted broadly, these provisions could be read to prohibit all showups, an effect we have held the Legislature did not intend. *State v. Rawls*, 207 N.C. App. 415, 423, 700 S.E.2d 112, 118 (2010). Similarly, these provisions could be read to prohibit any use of photographs to make an identification other than in a photo array.

We hold that the EIRA does not apply to such single-photograph identifications because they are not lineups. The use of a single photograph (or two photographs of the same person, as here) to make an identification has been criticized as "highly suggestive." LaFave, *Criminal Procedure* § 7.4(e). The same is true of showups. *See State v. Turner*, 305 N.C. 356, 364, 289 S.E.2d 368, 373 (1982) (describing showups as "suggestive and unnecessary"). Nevertheless, we held in *Rawls* that there was no indication that the Legislature intended the EIRA to ban showups, and the Legislature has not since amended the statute to indicate otherwise. *Rawls*, 207 N.C. App. at 423, 700 S.E.2d at 118.

The procedure used here might be called a photographic showup; it has similar benefits and suffers from similar weaknesses as a live showup, in which the witness is confronted with a single suspect, often in handcuffs or otherwise detained. *Compare Turner*, 305 N.C. at 364, 289 S.E.2d at 373 (describing showups as "the practice of showing suspects singly to witnesses for purposes of identification") *with* LaFave, *Criminal Procedure* § 7.4(e) n. 85-86 (collecting cases that describe various uses of a single photograph to make an identification, many of which criticize the practice as "suggestive"). In both cases, only a

small number of suspects were presented to the witness (three in *Rawls*, one here) a short time after the crime was committed.

As we noted in *Rawls*, our Supreme Court has recognized the benefits of the showup as an investigative technique. *Rawls*, 207 N.C. App. at 422, 700 S.E.2d at 117. We observed in *Rawls* that "the showup is a much less restrictive means of determining, at the earliest stages of the investigation process, whether a suspect is indeed the perpetrator of a crime, allowing an innocent person to be released with little delay and with minimal involvement with the criminal justice system." *Id.* (citations, quotation marks, brackets, and ellipses omitted). Like a live showup, the photographic showup here was done promptly after the officers saw the passenger flee, while their memory of the incident was still fresh. Even more than a live showup, the technique used by police here allowed them to determine at an early stage of their investigation whether the lead they received from a fellow officer was worth pursuing. We do not believe that the Legislature intended to prevent police officers from consulting with a photograph in their database to follow up on leads they are given by other officers. Therefore, we hold that the trial court correctly concluded that the EIRA does not apply here.

C.   Impermissibly Suggestive Identification Procedure

Even if the EIRA does not apply, the normal due process rules still do. Defendant argues in the alternative that the procedure employed here was impermissibly suggestive. We hold that even assuming the procedure was impermissibly suggestive, the officers' in-court identification was admissible because it was based on an independent source.

The trial court found that Officer Ragland was "10 feet from the passenger when he saw his face." The passenger "looked directly at Officer Ragland." Sgt. Ragland "had a clear unobstructed view of the fleeing passenger who looked straight at him[,]" from "about 5 to 7 yards" away. Given that both officers had a clear and unobstructed view of the suspect, the trial court concluded that "the in-court identification of the accused by Officer Darryl Ragland and by Sgt. Jamie Ragland is of independent origin."   Defendant does not challenge this conclusion.

Even assuming the out-of-court identification procedure was impermissibly suggestive, the officers' in-court identifications would still be admissible if those in-court identifications had an origin independent of the impermissible procedure. *State v. Knight*, 282 N.C. 220, 226, 192 S.E.2d 283, 287 (1972); *State v.*

*Jordan*, 49 N.C. App. 561, 566, 272 S.E.2d 405, 409 (1980); *State v. Pulley*, 180 N.C. App. 54, 64-65, 636 S.E.2d 231, 239 (2006), *disc. rev. denied*, 361 N.C. 574, 651 S.E.2d 375 (2007). Since the trial court concluded that the in-court identifications had an "independent origin," and "were not tainted by any pretrial identification procedure," and defendant does not challenge that conclusion, we must hold that the trial court did not err in denying defendant's motion to suppress the in-court identifications. *See Jordan*, 49 N.C. App. at 566, 272 S.E.2d at 409.

## III. Conclusion

For the foregoing reasons, we hold that the trial court did not err by denying defendant's motion to suppress and admitting the in-court identifications.

NO ERROR.

Chief Judge MCGEE and Judge BRYANT concur.