IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-932

Filed: 5 May 2020

Mecklenburg County, No. 16 CRS 246543

STATE OF NORTH CAROLINA

v.

DEVANTEE MARQUISE REAVES-SMITH, Defendant.

Appeal by defendant from judgment entered 28 March 2019 by Judge Karen Eady-Williams in Mecklenburg County Superior Court. Heard in the Court of Appeals 15 April 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Michael E. Bulleri, for the State.*

*W. Michael Spivey for defendant-appellant.*

BERGER, Judge.

On March 28, 2019, a Mecklenburg County jury convicted Devantee Marquise Reaves-Smith ("Defendant") of attempted robbery with a dangerous weapon. Defendant appeals, arguing the trial court erred when it (1) denied his motion to suppress evidence of a show-up identification, and (2) failed to instruct the jury about purported noncompliance with the North Carolina Eyewitness Identification Reform Act (the "Act"). We disagree.

Factual and Procedural Background

On December 16, 2016, two men attempted to rob Francisco Alejandro Rodriguez-Baca (the "victim") in a McDonald's restaurant parking lot. The victim did not give the men any money, but instead offered to buy them something to eat. One of the suspects, armed with a revolver, fired a shot in the air, and the two perpetrators fled the scene on foot. The victim ran to a nearby parking lot. There, he found Officer Jon Carroll ("Officer Carroll") and told him what had just occurred.

The victim described the man armed with the revolver as a "slim African-American male" who was wearing a grayish sweatshirt, a black mask, a backpack, and gold-rimmed glasses. The victim later identified Defendant as the individual armed with the revolver.

Officer Carroll testified that he had heard a gunshot just before the victim approached him. According to Officer Carroll, the victim described the suspects as: "two black males, approximately five-foot ten-inches in height . . . both had grayish colored hoodies, . . . had book bags, face mask[s] and gold-rimmed glasses." Officer Carroll relayed this description to law enforcement officers over the radio. The victim stayed with Officer Carroll while other officers searched for the suspects.

Approximately seven minutes later, Officer Rodrigo Pupo ("Officer Pupo") spotted "two black males . . . . One of them had a grey hoodie. The other one had a black hoodie . . . they were both wearing backpacks" leaving a Bojangles restaurant. Officer Pupo reported the sighting over the radio. As another officer arrived at the

restaurant, Defendant fled the area on foot. Defendant was apprehended a short time later wearing a black ski mask, and he had 80 .22-caliber bullets inside his backpack. The other suspect was not apprehended at the time. Defendant later identified Koran Hicks as his accomplice.

Officer Carroll transported the victim to Defendant's location to conduct a show-up identification. Officer Jones testified that the show-up was conducted around dusk and the spotlights from Officer Carroll's vehicle were activated. The victim identified Defendant as the assailant with the gun. Officer Jones' body camera recorded the identification.

On January 3, 2017, Defendant was indicted for attempted robbery with a dangerous weapon. On October 2, 2018, Defendant filed a motion to suppress the in-court and out-of-court identifications by the victim. The trial court denied Defendant's motion regarding the out-of-court identification, and reserved ruling on the in-court identification for the trial judge. At trial, the jury found Defendant guilty of attempted robbery with a dangerous weapon.

Defendant appeals, alleging the trial court erred when it (1) denied his motion to suppress evidence of the show-up identification, and (2) failed to instruct the jury concerning purported noncompliance with the Act. We disagree.

## Analysis

I. Motion to Suppress

Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "The trial court's conclusions of law . . . are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

A. <u>Compliance with the Act</u>

A show-up is "[a] procedure in which an eyewitness is presented with a single live suspect for the purpose of determining whether the eyewitness is able to identify the perpetrator of a crime." N.C. Gen. Stat. § 15A-284.52(a)(8) (2019). The purpose of a show-up is to serve as "a much less restrictive means of determining, at the earliest stages of the investigation process, whether a suspect is indeed the perpetrator of a crime, allowing an innocent person to be released with little delay and with minimal involvement with the criminal justice system." *State v. Rawls*, 207 N.C. App. 415, 422, 700 S.E.2d 112, 117 (2010) (*purgandum*). A show-up is just one identification method that law enforcement may use "to help solve crime, convict the guilty, and exonerate the innocent." N.C. Gen. Stat. § 15A-284.51 (2019).

To comply with the requirements set forth by the General Assembly, a show-up must meet the following requirements:

> (1) A show-up may only be conducted when a suspect matching the description of the perpetrator is located in close proximity in time and place to the crime, or there is reasonable belief that the perpetrator has changed his or her appearance in close time to the crime, and only if there are circumstances that require the immediate display of a suspect to an eyewitness.
>
> (2) A show-up shall only be performed using a live suspect and shall not be conducted with a photograph.
>
> (3) Investigators shall photograph a suspect at the time and place of the show-up to preserve a record of the appearance of the suspect at the time of the show-up procedure.

N.C. Gen. Stat. § 15A-284.52(c1) (omitting requirements for juvenile offenders).

Defendant contends that "the trial court did not make any findings of circumstances that required an immediate display of [Defendant] to the witness." The trial court's findings of fact, which were each supported by competent evidence, are set forth below:

> 1. On December 16th, 2016 Charlotte Mecklenburg Police Department Officer J.J. Carroll heard a loud pop that be (*sic*) believed was a gun shot while he was sitting in his patrol vehicle.
>
> 2. Within a few moments, Mr. Francisco Rodriguez-Baca approached Officer Carroll and told him he was just robbed by two black males. Both males were about 5' 10", wearing grey colored hoodies, black masks, both had book bags, and both were wearing glasses.
>
> 3. Mr. Francisco Rodriguez-Baca had a brief conversation with the suspects. As such, the victim had an opportunity to view the suspects.

4. Mr. Francisco Rodriguez-Baca stated that one of the suspects fired a shot and then fled off on foot towards South Boulevard.

5. Officer Carroll put out a "be on the lookout" (BOLO) request over the radio, giving the description of the suspects.

6. Within seven minutes of the BOLO, two suspects were seen at a nearby Bo Jangles (*sic*) restaurant. The two suspects matched the description given by the victim in every way, except for the glasses.

7. Officers attempted to detain the suspects, but they fled on foot.

8. A nine minute foot chase ensued by officers. Sgt. Adam Jones of the Charlotte Mecklenburg Police Department was able to detain one of the suspects, later identified as the Defendant.

9. The Defendant was detained less than 1/2 of a mile from the site of the robbery.

10. Sgt. Jones placed the Defendant in handcuffs for the purposes of detention.

11. Ofc. Carroll drove Mr. Francisco Rodriguez-Baca to the Defendant's location in order to do a show-up.

12. Mr. Francisco Rodriguez-Baca was inside a police vehicle with Officer Carroll, while Sgt. Jones escorted the defendant in front of the police vehicle. It was dark out when the show-up was conducted, however the vehicles headlights were used for illumination.

13. The Defendant was approximately 15 yards from the front of the vehicle. The Defendant was in handcuffs, being held by the arm of a uniformed police officer, and standing in front of a marked police cruiser.

14. Mr. Francisco Rodriguez-Baca identified the Defendant as one of the suspects, and indicated he was the shooter. He did not say how confident he was in his identification.

15. The show-up identification procedure was recorded on body-worn camera (BWC) by Sgt. Adam Jones.

16. The show-up identification procedure was done close in time to the robbery and was no more than 30 minutes after it occurred.

17. As a result of the identification the Defendant was charged with attempted robbery with a dangerous weapon, conspiracy, assault with a deadly weapon, resisting a public officer, possession of a schedule IV controlled substance, and possession of marijuana paraphernalia.

These findings established that Defendant and an accomplice were suspected of a violent crime that included the discharge of a firearm. Defendant matched the description provided by the victim, and he fled when officers attempted to detain him. Defendant's actions forced officers to pursue him on foot for more than nine minutes. As the trial court noted, "given the nature of the crime, [and] the efforts on the part of [Defendant] to flee[,]" the circumstances required immediate display of Defendant. Because an armed suspect, who is not detained, poses an imminent threat to the public, the trial court's findings supported immediate display of Defendant to the victim. *See e.g., State v. Guy*, ___ N.C. App. ___, ___, 822 S.E.2d 66, 72 (2018) ("Even though the suspects had already fled [the crime scene], there was still an ongoing emergency that posed danger to the public."). Moreover, had the victim determined

that Defendant was not the perpetrator, officers could have immediately released Defendant and continued their search for the suspects. Thus, the officers' actions in conducting the show-up identification were consistent with the purpose of the Act, *i.e.*, "solve crime, convict the guilty, and exonerate the innocent." N.C. Gen. Stat. § 15A-284.51.

Based on the findings of fact set forth above, the trial court made the following conclusions of law:

1. The show-up conducted in this case complied with the North Carolina Eyewitness Identification Reform Act, G.S. 284.52.

2. The Defendant matched the description given by the victim . . . .

3. The Defendant was located in close in time and proximity to the robbery.

4. The show-up was done with a live suspect.

Although conclusions 2, 3, and 4 contain mixed findings of fact and conclusions of law, "we do not base our review of findings of fact and conclusions of law on the label in the order, but rather, on the substance of the finding or conclusion." *State v. Johnson*, 246 N.C. App. 677, 683, 783 S.E.2d 753, 758 (2016) (citation omitted). Here, the trial court's conclusion of law that the officers complied with the Act is supported by competent evidence. Defendant matched the victim's description. Defendant was located at a Bojangles restaurant less than 800 feet away from the McDonalds restaurant parking lot within a few minutes of a BOLO being issued. The show-up

identification was conducted with a live person which was recorded on the officers' body cameras. In addition, the nature and circumstances surrounding apprehending an armed, violent suspect required officers to immediately display Defendant. Thus, the trial court's findings of fact support its conclusion of law. Accordingly, the show up conducted here satisfied the requirements of the Act.

B. Eyewitness Confidence Statement

Defendant also argues that the trial court failed to make findings of fact about Officer Carroll's failure to obtain a confidence statement and information related to the victim's vision pursuant to N.C. Gen. Stat. Section 15A-284.52(c2)(2).

"[T]his Court's duty is to carry out the intent of the legislature. As a cardinal principle of statutory interpretation, if the language of the statute is clear and is not ambiguous, we must conclude that the legislature intended the statute to be implemented according to the plain meaning of its terms." *State v. Crooms*, 261 N.C. App. 230, 234, 819 S.E.2d 405, 407 (2018) (citation and quotation marks omitted).

Section 15A-284.52(c2) states that

> The North Carolina Criminal Justice Education and Training Standards Commission shall develop a policy regarding standard procedures for the conduct of show-ups in accordance with this section. The policy shall apply to all law enforcement agencies and shall address all of the following, in addition to the provisions of this section:
>
> (1) Standard instructions for eyewitnesses.

    (2) Confidence statements by the eyewitness, including information related to the eyewitness' vision, the circumstances of the events witnessed, and communications with other eyewitnesses, if any.

    (3) Training of law enforcement officers specific to conducting show-ups.

    (4) Any other matters deemed appropriate by the Commission.

N.C. Gen. Stat. § 15A-284.52(c2).

In North Carolina, policies established by State agencies are "*nonbinding interpretive statement[s] . . . used purely to assist a person to comply with the law,* such as a guidance document." N.C. Gen. Stat. § 150B-2(7a) (2019) (emphasis added). "When a term has long-standing legal significance, it is presumed that legislators intended the same significance to attach by use of that term, absent indications to the contrary." *State v. Fletcher*, 370 N.C. 313, 329, 807 S.E.2d 528, 540 (2017) (citation and quotation marks omitted). There is no indication that the legislature's use of the term "policy" in Section 15A-284.52(c2) was intended to have any other significance or meaning. In fact, the delegation of authority to establish other policies the agency deemed appropriate is a clear indication that the guidelines established pursuant to Section 15A-284.52(c2) were just that: guidelines.

Statutes are binding acts of the General Assembly. By definition, policies from State agencies are nonbinding guidelines. The plain language of the statute shows that the legislature delegated authority to the North Carolina Criminal Justice

Education and Training Standards Commission to establish nonbinding guidelines to assist law enforcement. Because the language of Section 15A-284.52(c2) does not place additional statutory requirements on law enforcement, but rather requires the North Carolina Criminal Justice Education and Training Standards Commission to develop nonbinding guidelines, only Section 15A-284.52(c1) sets forth the requirements for show-up identification compliance.

C. Impermissibly Suggestive or Likelihood of Misidentification

Next, Defendant claims that the trial court's findings of fact did not support its conclusion of law that the show-up was not "impermissibly suggestive or created a substantial likelihood of misidentification."

Our Courts have previously held that show-up identifications "may be inherently suggestive for the reason that witnesses would be likely to assume that the police presented for their view persons who were suspected of being guilty of the offense under investigation." *State v. Turner*, 305 N.C. 356, 364, 289 S.E.2d 368, 373 (1982) (citations omitted). However, "[p]retrial show-up identifications . . . , even though suggestive and unnecessary, are not *per se* violative of a defendant's due process rights. The primary evil sought to be avoided is the substantial likelihood of irreparable misidentification." *Id.* at 364, 289 S.E.2d at 373 (citations omitted).

This Court applies a two-step process to determine "whether identification procedures violate due process." *State v. Malone*, 256 N.C. App. 275, 290, 807 S.E.2d

639, 650 (2017) (citation and quotation marks omitted), *aff'd in part, rev'd in part,* 373 N.C. 134, 833 S.E.2d 779 (2019). First, we must determine "whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification." *Id.* at 290, 807 S.E.2d at 650 (citation omitted). Second, if we determine that the identification procedures were impermissibly suggestive, we must then determine "whether, under all the circumstances, the suggestive procedures employed gave rise to a substantial likelihood of irreparable misidentification." *Id.* at 290, 807 S.E.2d at 650 (citation omitted). This inquiry "depends upon whether under the totality of circumstances surrounding the crime itself the identification possesses sufficient aspects of reliability." *State v. Richardson*, 328 N.C. 505, 510, 402 S.E.2d 401, 404 (1991) (citation and quotation marks omitted). The central question is whether under the totality of the circumstances the identification was reliable even if the confrontation procedure was suggestive. *State v. Oliver*, 302 N.C. 28, 45-46, 274 S.E.2d 183, 195 (1981).

To determine the reliability of a pre-trial identification, this Court considers the following factors:

> (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*State v. Gamble*, 243 N.C. App. 414, 420, 777 S.E.2d 158, 163 (2015) (citations omitted).

The show-up identification proceeding at issue here did not violate Defendant's due process rights as it was not impermissibly suggestive, nor did it create a substantial likelihood of misidentification.

The evidence presented at the motion to suppress hearing satisfies the reliability factors in *Gamble*. The victim had the opportunity to view Defendant during the robbery and provided a detailed description of the suspects to Officer Carroll as two black males "approximately five-ten in height wearing gray-colored hoodies" with "book bags, a black-colored mask or some type of covering over their face" and "both were wearing glasses."

The description enabled officers to identify the two suspects "seven minutes later" about "800 feet" from the original crime scene. The victim immediately recognized Defendant as "one of the suspects" and that he was the "guy who shot at him." Finally, the victim identified Defendant as the individual with the revolver approximately "fourteen minutes" from the time he heard the gunshot to the time of the show-up identification.

Therefore, the trial court did not err in concluding that the show-up was not "impermissibly suggestive or [that it] created a substantial likelihood of misidentification."

II. <u>Jury Instructions</u>

Defendant concedes that he failed to object to the jury instructions and that he did not request an instruction concerning compliance or noncompliance with the Act. However, Defendant argues that the trial court committed plain error by not instructing the jury that it may consider credible evidence of compliance or noncompliance to determine the reliability of eyewitness identifications. We disagree.

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 516-17, 723 S.E.2d 326, 334 (2012) (*purgandum*).

"In instructing the jury, it is well settled that the trial court has the duty to declare and explain the law arising on the evidence relating to each substantial feature of the case." *State v. Scaturro*, 253 N.C. App. 828, 835, 802 S.E.2d 500, 506 (2017) (*purgandum*).

Section 15A-284.52(d) provides various remedies "as consequences of compliance or noncompliance with the requirements of" Section 15A-284.52. N.C. Gen. Stat. § 15A-284.52(d). Section 15A-284.52(d)(3) provides that "[w]hen evidence

of compliance or noncompliance with the requirements of this section has been presented at trial, the jury shall be instructed that it may consider credible evidence of compliance or noncompliance to determine the reliability of eyewitness identifications." N.C. Gen. Stat. § 15A-284.52(d)(3).

Defendant argues that he was entitled to jury instructions under Section 15A-284.52(d)(3) because Officer Carroll did not obtain an eyewitness confidence level under Section 15A-284.52(c2)(2). However, Section 15A-284.52(d)(3) specifically limits remedies for "compliance or noncompliance *with the requirements of this section.*" N.C. Gen. Stat. § 15A-284.52(d)(3) (emphasis added). As set forth above, Section 15A-284.52(c2) concerns policies and guidelines established by the North Carolina Criminal Justice and Training Standards Commission, it does not establish the requirements for show-up identifications. Those requirements are specifically enumerated in subsection (c1). Thus, because officers complied with the show-up procedures in Section 15A-284.52(c1), Defendant was not entitled to a jury instruction on noncompliance with the Act.

## Conclusion

For the reasons stated herein, Defendant received a fair trial free of error.

NO ERROR.

Judges TYSON and COLLINS concur.