NO. COA14-228

NORTH CAROLINA COURT OF APPEALS

Filed: 5 September 2014

STATE OF NORTH CAROLINA

    v.

MONTICE TERRILL HARVELL

Mecklenburg County
Nos. 12 CRS 222254-55
      12 CRS 34886

Appeal by defendant from judgment entered 30 August 2013 by Judge Richard D. Boner in Mecklenburg County Superior Court. Heard in the Court of Appeals 14 August 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Josephine Tetteh, for the State.*
>
> *Sharon L. Smith, for defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Montice Terrill Harvell ("Defendant") appeals from a judgment sentencing him as a habitual felon for felony breaking and entering and felony larceny. Defendant argues that the trial court erred by denying his motion to suppress the show-up identification and by giving a flight instruction to the jury. Defendant also argues that the trial court violated statutory mandate by responding to a jury question regarding the distinction between "taking" and "carrying away" without

affording counsel an opportunity to be heard before answering the jury's inquiry. For the following reasons, we find no error.

## I. Facts and Procedural History

On 11 June 2012, Defendant was indicted on one count of felony breaking and entering and one count of felony larceny. Defendant was also indicted on attaining habitual felon status on 30 July 2012. On 19 March 2013, Defendant filed a motion to suppress the in-court and out-of-court identification by Maurice Perdue ("Mr. Perdue"). Defendant's case came before the Mecklenburg County Superior Court on 28 August 2013. After a hearing, the trial court denied Defendant's motion to suppress. The jury found Defendant guilty of felony breaking and entering and felony larceny and Defendant pled guilty to attaining habitual felon status. The record and trial transcript tended to show the following facts.

On 21 May 2012, around 2:15 p.m., Army veteran Mr. Perdue left his Charlotte home on Panglemont Drive to pick up a sandwich for lunch. Before leaving, Mr. Perdue locked his doors and set his house alarm. Thirty minutes later, Mr. Perdue returned home to find an unfamiliar Ford Explorer parked in his driveway with the back door open. He also noticed that his

front door was wide open. He parked his car, unholstered his pistol, and approached the open front door of his residence. Mr. Perdue looked in through the open front door and saw a black male standing in front of his TV stand with Mr. Perdue's television and XBOX on the floor in front of the stand. At the time, Mr. Perdue was approximately twenty feet from the man. He ordered the black male to "freeze," but the man turned and ran out the open back door. Mr. Perdue ran after the man.

When Mr. Perdue got to his back door, the black male was running diagonally across his neighbor's yard. He then turned and looked over his shoulder at Mr. Perdue. Mr. Perdue fired a shot from his pistol at the black male. The black male turned and cut in between two neighboring homes. Mr. Perdue ran in between his house and his neighbor's house toward his front yard in order to cut the man off. When Mr. Perdue reached his front yard, the black male ran out from in between the houses and toward Mr. Perdue. Mr. Perdue was only twenty feet from the man and was able to observe his full face as the man ran toward him. Mr. Perdue fired two shots at the man who took off running around the neighbor's house and up the street. Mr. Perdue continued to chase after the man yelling, "Stop running. I'm going to catch you, I'm going to get you." Mr. Perdue fired

three more shots at the ground near the man intending to warn him not to return to Mr. Perdue's home. The black male ran up a hill in the neighborhood and turned to look back at Mr. Perdue. Mr. Perdue ran back to his house to call 911.

During Mr. Perdue's encounter with the black male, Mr. Perdue was able to observe the man's face three different times. While on the phone with the 911 operator, Mr. Perdue described the man as a black male in his mid-twenties with dreadlocks and a goatee wearing a white T-shirt and dark jeans.

That same day, Officer Robert Roberts ("Officer Roberts") with the Mecklenburg Police Department was on patrol in a marked patrol car near Mr. Perdue's neighborhood. Officer Roberts received the dispatch call and responded to Mr. Perdue's neighborhood. In an attempt to cut off a fleeing suspect, Officer Roberts drove past the neighborhood entrance and turned down a small dirt road not normally used by traffic that backed up to the houses in Mr. Perdue's neighborhood.

As he was driving, Officer Roberts saw Defendant walk out of the woods behind the houses. Defendant matched the description Mr. Perdue gave to the 911 operator; he was a black male in his mid-twenties with a goatee and dreadlocks and wearing a white T-shirt. Defendant walked up to the window of a

white Dodge Charger and appeared to briefly talk with the driver before the car drove away.  Officer Roberts pulled his marked patrol car up to Defendant and asked him to "wait a minute[.]"  Officer Roberts then stepped out of his vehicle and approached Defendant on foot.

Upon approaching Defendant, Officer Roberts observed that Defendant "was hot . . . [and] sweating. He had . . . little berry-like things that attach to your clothing after you run through the woods.  He had them all over his pants, [and Officer Roberts] saw he had sandals on."  Officer Roberts advised Defendant that there had been a crime in the area and that Defendant matched the description of the suspect.  Officer Roberts asked Defendant if he would mind waiting for a few minutes and asked to perform a pat down of Defendant to check for weapons.  Defendant agreed to wait and to the pat down.  During the pat down, Officer Roberts found a pair of winter gloves in Defendant's right pocket which Officer Roberts thought was odd because "[i]t was hot out that day, [and there was] no reason to have winter gloves."

Officer Andrew Weisner ("Officer Weisner") with the Mecklenburg Police Department also responded to the dispatch call and arrived at Mr. Perdue's house within 15 minutes.  When

Officer Weisner arrived at the house, Officer Roberts radioed that he had a suspect in custody matching the description Mr. Perdue gave to the 911 operator. Mr. Perdue testified that officers informed him "they had detained an individual and wanted me to go and identify him to see if that was the person that was in my house."

Officer Weisner took Mr. Perdue two streets over to where Officer Roberts was waiting with Defendant. At the time, Defendant was handcuffed and seated in the back seat of Officer Roberts' patrol car with the back door open. When Mr. Perdue arrived, Officer Roberts had Defendant step out of the patrol car and face Officer Weisner's vehicle. When he saw Defendant, Mr. Perdue leaned out the window and immediately identified Defendant as the person who had been inside his house and who he subsequently chased.

After Officer Weisner's testimony, the State rested. Defendant moved to dismiss both charges, which the trial court denied. Defendant rested without presenting any evidence.

The jury found Defendant guilty of felony breaking and entering and felony larceny. Defendant pled guilty to habitual felon status and the trial court sentenced Defendant to a term

of 72 to 99 months.  Defendant gave oral notice of appeal in open court.

## II.  Jurisdiction

Defendant's appeal from the superior court's final judgment lies of right to this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b), 15A-1444(a) (2013).

## III. Analysis

### A. Show-up Identification

Defendant contends that the trial court erred in denying his motion to suppress Mr. Perdue's show-up identification of Defendant.  Specifically, Defendant argues the trial court erred because Mr. Perdue's mindset and other circumstances surrounding the "inherently suggestive" show-up identification gave rise to a substantial likelihood of irreparable misidentification.  We disagree.

Generally, our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."  *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982).

Here, Defendant made a pretrial motion to suppress Mr. Perdue's identification of Defendant as the individual who he saw in his home on 21 May 2012. Defendant, however, did not object to the admission of the in-court identification by Mr. Perdue. This Court has held that "a pretrial motion to suppress . . . is not sufficient to preserve for appeal the issue of admissibility of evidence." *State v. Grooms*, 353 N.C. 50, 66, 540 S.E.2d 713, 723 (2000); *see also State v. Golphin*, 352 N.C. 364, 405, 533 S.E.2d 168, 198 (2000). The North Carolina Supreme Court "has elected to review unpreserved issues for plain error when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence." *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996) (internal quotation marks and citation omitted). Plain error arises when the error is "so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]" *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (internal quotation marks and citation omitted). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

Our Supreme Court has recognized show-up identifications, whereby a single suspect is shown to a witness shortly after the crime, as inherently suggestive "because the witness would likely assume that the police had brought [him] to view persons whom they suspected might be the guilty parties." *State v. Oliver*, 302 N.C. 28, 45, 274 S.E.2d 183, 194 (1981) (internal quotation marks and citation omitted) (alterations in original). However, "suggestive pretrial show-up identifications are not *per se* violative of a defendant's due process rights." *State v. Watkins*, 218 N.C. App. 94, 105, 720 S.E.2d 844, 851 (2012) (internal quotation marks and citation omitted). "The test under the due process clause as to pretrial identification procedures is whether the totality of the circumstances reveals pretrial procedures so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice." *State v. Jackson*, ___ N.C. App. ___, ___, 748 S.E.2d 50, 57 (2013).

In determining the likelihood of irreparable misidentification, we consider five factors: (1) the witness' opportunity to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the

witness' prior description of the defendant, (4) the witness' level of certainty at the time of confrontation, and (5) the length of time between the crime and the confrontation. *State v. Rawls*, 207 N.C. App. 415, 424, 700 S.E.2d 112, 118–19 (2010); *Harris*, 308 N.C. at 164, S.E.2d at 95. In evaluating these factors, we consider whether "under the totality of the circumstances surrounding the crime, the identification possesses sufficient aspects of reliability." *State v. Jackson*, ___ N.C. App. ___, ___, 748 S.E.2d 50, 58 (2013); *see also State v. Breeze*, 130 N.C. App. 344, 352, 503 S.E.2d 141, 147 (1998).

Here, Mr. Perdue was able to view Defendant's face three separate times during the encounter. During two of those observations, Mr. Perdue was only twenty feet from Defendant. At the time of the incident, Mr. Perdue's senses were in a heightened state. Mr. Perdue testified that the incident took him "back into a combative mind state as if [he] was back in Iraq again" and that "[w]hen you're in combat, it's all – it's game on, all senses are on . . . ."

Defendant argues that Mr. Perdue's description was inaccurate because he initially told officers that the suspect was "tall" and Defendant is only 5'7". Mr. Perdue accurately described the suspect as being a "black male in his mid twenties

with dreadlocks and a goatee wearing a white T-shirt and dark colored jeans." Mr. Perdue testified that he did not remember describing the suspect as "tall" and that "[h]e was not tall to my understanding of it."

Mr. Perdue was "very certain" about his identification stating that he was "[o]ne hundred percent" certain that Defendant was the man he had seen inside his living room. Officer Weisner also testified that Mr. Perdue did not struggle in identifying Defendant, but rather "[h]e actually leaned out the window when he saw [Defendant] and immediately identified him."

Mr. Perdue's identification of Defendant occurred within fifteen to twenty minutes of Mr. Perdue finding the suspect in his home. Officers arrived at Mr. Perdue's house in fifteen to twenty minutes of the 911 call and within minutes Mr. Perdue was taken two streets over to identify the suspect.

Although the show-up identification was suggestive, under the totality of the circumstances the show-up identification was not so impermissibly suggestive as to cause irreparable mistaken identification and violate Defendant's constitutional right to due process. Accordingly, we hold that the trial court did not plainly err in denying Defendant's motion to suppress.

## B. Flight Instruction to the Jury

Defendant contends that the trial court erred in instructing the jury regarding flight where there was no evidence that Defendant fled after committing the crime. We disagree.

"[Arguments] challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). Under a *de novo* review, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (internal quotation marks and citation omitted).

"The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *State v. Cameron*, 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973). "[A] trial judge should not give instructions to the jury which are not supported by the evidence produced at the trial." *Id.*

Our Supreme Court has held that

> an instruction on flight is justified if
> there is some evidence in the record

> reasonably supporting the theory that the defendant fled after the commission of the crime charged. Mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension.

*State v. Blakeney*, 352 N.C. 287, 314, 531 S.E.2d 799, 819 (2000) (internal quotation marks and citations omitted). Further, we have also held that "an action that was not part of Defendant's normal pattern of behavior . . . could be viewed as a step to avoid apprehension." *State v. Hope*, 189 N.C. App. 309, 319, 657 S.E.2d 909, 915 (2008) (quotation marks and citation omitted).

In *State v. Ethridge*, 168 N.C. App. 359, 607 S.E.2d 325 (2005), this Court upheld the flight instruction to the jury where the State presented some evidence of flight. In *Ethridge*, the defendant was charged with breaking and entering, larceny after breaking and entering, and possession of stolen goods. *Id.* at 361, 607 S.E.2d at 327. The defendant broke into a vacant home and removed more than thirty items from the home, including furniture and air conditioners. *Id.* at 361, 607 S.E.2d at 326–27. A neighbor noticed a car that was backed into the driveway of the vacant home with the tailgate open and with what appeared to be a coffee table hanging out the back. *Id.* at 361, 607 S.E.2d at 327. The neighbor recognized one of the men

and recognized the car, which the neighbor saw drive away from the house, as belonging to the defendant. *Id.* Police officers quickly located the defendant's car but were unable to locate the defendant until about a month later. *Id.* This Court held that

> the State provided some evidence of flight. Defendant left the crime scene shortly after [the neighbor] arrived home. Furniture that had been in the house was found scattered in the backyard. While the police found [the defendant's] vehicle, they were not able to locate [the defendant] for several weeks. This evidence reasonably supports the theory that [the defendant] fled after commission of the crimes charged. We therefore find no error with the trial court's instructing the jury on flight.

*Id.* at 363, 607 S.E.2d at 328.

Here, similar to *Ethridge*, the State presented evidence that reasonably supports the theory that Defendant fled after breaking and entering into Mr. Perdue's home. Defendant argues that he ran out the back door after Mr. Perdue pulled his firearm and that Defendant fled to avoid being shot. Mr. Perdue, however, testified that when he approached his front door and saw Defendant standing in his living room, Defendant looked at Mr. Perdue and then took off running out the back door. It was not until Defendant was already outside the home and running across the neighbor's yard that Mr. Perdue fired the

first shot. Thus, Defendant was already fleeing from the scene before Mr. Perdue fired any shots at Defendant.

Officer Roberts testified that not more than fifteen minutes after the 911 call, he saw Defendant on a dirt road that was "on the back side of [Mr. Perdue's] neighborhood" and was "not a road that people use for traffic." He also testified that he saw Defendant coming from behind a row of houses that backed up to the dirt road "which [was] rare" because it was "through high grass." Defendant also had "hitchhikers, little berry-like things that attach to your clothing after you run through the woods. . . . all over his pants[.]" Although Defendant in this case was located shortly after the crime, unlike in *Ethridge* where the defendant was not located for weeks, the evidence still reasonably supports the theory that Defendant fled after the commission of the crime.

Defendant also argues that the flight instruction was prejudicial to Defendant because the only evidence against Defendant was Mr. Perdue's identification, and cites *State v. Lee*, 287 N.C. 536, 541, 215 S.E.2d 146, 149 (1975) ("Evidence of flight is not only competent but often considered *material* . . . where there is a dispute or doubt as to the identity . . . [of] the perpetrator of the crime.") (internal quotation marks and

citations omitted). In *Lee*, evidence tended to show that the witness did not consistently identify the defendant as one of the assailants. *Id.* In this case, however, we held above that Mr. Perdue's identification contained sufficient aspects of reliability and he has consistently identified Defendant as the person he saw in his home. Mr. Perdue provided an accurate description of the suspect and was "very certain" Defendant was the man he saw inside his house and had "no doubt about it." Thus, Defendant's reliance on *Lee* is misplaced. Accordingly, the flight instruction was not prejudicial and we hold that the trial court did not err in instructing the jury on flight.

## C. Clarifying Terms for the Jury

Defendant also contends that the trial court violated statutory mandate by responding to a jury question regarding the distinction between "taking" and "carrying away" without affording counsel an opportunity to be heard. Defendant argues further that he was prejudiced by the trial court's error as the court's impromptu demonstration improperly assisted the State in proving the elements of the case. We disagree.

Pursuant to N.C. Gen. Stat. § 15A-1234 (2013),

> [a]fter the jury retires for deliberation,
> the judge may give appropriate additional
> instructions to:

> (1) Respond to an inquiry of the jury made in open court; or
> (2) Correct or withdraw an erroneous instruction; or
> (3) Clarify an ambiguous instruction; or
> (4) Instruct the jury on a point of law which should have been covered in the original instructions.

Further,

> [b]efore the judge gives additional instructions, he must inform the parties generally of the instructions he intends to give and afford them an opportunity to be heard. The parties upon request must be permitted additional argument to the jury if the additional instructions change, by restriction or enlargement, the permissible verdicts of the jury. Otherwise, the allowance of additional argument is within the discretion of the judge.

N.C. Gen. Stat. § 15A-1234(c).

Here, after receiving a request from the jury on the clarification of the terms "taking" and "carrying away," the trial court informed the parties that it was "going to tell [the jury] the definition of taking is to lay hold of something with one's hands." Neither party objected at that time to the proposed instructions. The trial court then instructed the jury on this definition and further demonstrated the difference between the two terms with a coffee cup. The trial court also repeated the elements of felony larceny.

Under N.C. Gen. Stat. § 15A-1234, the judge "must inform the parties *generally* of the instructions he intends to give . . . ." N.C. Gen. Stat. § 15A-1234(c) (emphasis added). Here, the trial court informed the parties of the additional instructions it intended to give and provided that exact definition to the jury. The trial court also provided further clarification of the two terms by visual demonstration. Although the trial court did not inform the parties of its visual demonstration, the statute only requires that the trial court inform the parties *generally*. The trial court provided the definition as stated and the demonstration was consistent with the provided definition, only providing further clarification of the two terms.

Additionally, neither party objected to the instructions after they were given. The trial court specifically asked both parties if there were "[a]ny objections to the instructions given by the [c]ourt." Defendant's counsel responded "[n]o, your Honor." Therefore, the trial court did not violate N.C. Gen. Stat. § 15A-1234 in making its additional instructions.

Defendant also argues that the trial court's failure to include the language that the State had the burden of proving all of the elements beyond a reasonable doubt after repeating

the elements of felony larceny improperly aided the State in proving its case. The jury previously submitted two inquiries to the trial court regarding which elements it was required to find. At 10:05 a.m., the jury entered the courtroom and the trial court further instructed the jury that the State was required to prove beyond a reasonable doubt all elements of the underlying offenses and repeated the required elements. Just over thirty minutes later, at 10:42 a.m., the jury was brought back into the courtroom for the additional instructions on "taking" and "carrying away." Since only thirty-seven minutes had passed since the trial court had reinstructed the jury on the elements and the State's burden of proving all elements beyond a reasonable doubt, Defendant was not prejudiced by the trial court omitting the language pertaining to the State's burden at this time.

Since the parties were given an opportunity to be heard and Defendant was not prejudiced by the additional instructions, we hold the trial court did not err in clarifying the elements of the underlying offenses and the distinction between "taking" and "carrying away."

## IV.  Conclusion

For the foregoing reasons, we find no error.

NO ERROR.

Judges STEELMAN and GEER concur.