IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-69

No. COA20-219

Filed 16 March 2021

Iredell County, Nos. 17CRS053140, 17CRS053141

STATE OF NORTH CAROLINA

v.

RONALD JASON GIBSON

Appeal by Defendant from judgments entered 12 August 2019 by Judge Julia Lynn Gullett in Iredell County Superior Court. Heard in the Court of Appeals 27 January 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Neil Dalton, for the State-Appellee.*

*Rudolf Widenhouse, by M. Gordon Widenhouse, Jr., for Defendant-Appellant.*

COLLINS, Judge.

¶ 1      Defendant Ronald Jason Gibson appeals from judgments entered upon jury verdicts of guilty of two counts of felony hit and run and one count of reckless driving. Defendant argues that the trial court erred by (1) failing to dismiss the two counts of felony hit and run for insufficient evidence and (2) instructing the jury on flight. We discern no error.

## I.    Procedural History

¶ 2        Defendant was indicted on two counts of felony hit and run, one count of aggressive driving, one count of reckless driving, and attaining habitual felon status. Defendant was tried by a jury and convicted of both counts of felony hit and run and one count of reckless driving; he was acquitted of a second count of reckless driving, which was submitted to the jury as a lesser-included offense of aggressive driving. Defendant pled guilty to having attained habitual felon status. The trial court sentenced Defendant as a prior record level II offender to two consecutive prison sentences of 83 to 112 months. Defendant timely gave oral notice of appeal in open court.

## II.        Factual Background

¶ 3        The State's evidence tended to show the following: On Thursday, 1 June 2017 at around 3:30 pm, William Sumrell was driving his motorcycle on I-40 with his fiancée, Sarah Bell, in the seat behind him. They were traveling with their friend Glenn Alphin, who was driving his own motorcycle. Sumrell was able to communicate by in-helmet intercom with Bell and by CB radio with Alphin. Sumrell and Alphin were in regular contact, coordinating their lane changes and other driving safety measures. It was a hot, sunny day.

¶ 4        West of Winston-Salem, I-40 was reduced to one lane because of road construction, causing traffic on I-40 to be "real backed up." Once Sumrell and Alphin got through the congested construction area, they returned to a normal highway

speed of about 70 miles per hour. Sumrell was about four car lengths ahead of Alphin. Sumrell testified that they were riding in a staggered configuration, with Sumrell closer to the center of the highway and Alphin closer to the edge, "[i]n case . . . I have to slam on brakes or something, he has a way to get out of the way. Has an exit out, so he's not running up under me."

¶ 5 Sumrell and Alphin agreed to pass a "semi"–an eighteen wheeled tractor-trailer truck–which was travelling in the right lane of the two westbound lanes. After they had passed the semi but before they could pull back into the right lane, a black car moved up fast behind them. They remained in the left lane as the black car switched to the right lane in front of the semi and moved on.

¶ 6 As they again were about to move back into the right lane, a white van, driven by Defendant, towing an open-topped U-Haul trailer pulled up quickly behind them. Defendant's van and trailer then cut into the right lane, in front of the semi and beside Alphin. Sumrell testified,

> I could see in my mirror the driver's hand was all outside the car or the vehicle doing something. And I asked [Alphin], I said, "what in the world?" And he said, "this guy come by me flipping me a bird and shouting." I said, "okay."
>
> So, the next thing I know, here comes the van beside me. And he did the same thing to me, hanging out the window, and shouting, and flipping me off, flipping [Bell] off, and spitting at us.

¶ 7        As Defendant moved past Sumrell, Alphin moved into the right lane, behind Defendant's trailer and in front of the semi. Sumrell testified that as he prepared to move into the right lane once Defendant had moved far enough ahead, Defendant "come across my lane about mid-way and slammed on the brakes." When Defendant's van and trailer cut in front of Sumrell, "[i]t was real close, so it was less than ten feet." Sumrell saw Defendant in the driver's side mirror of the van, "looking in the mirror, looking at me laughing." Sumrell expounded that Defendant

> come about halfway across in the middle of the lane. It doesn't slow down coming across the lane, and then slammed on brakes. I put on my brakes to stop or slow down to try to avoid and get on over, when his brake lights went off and came right back on again.

¶ 8        At this point, Sumrell was riding at about 70 miles per hour. Sumrell further testified,

> After [Defendant] first came across and hit the brakes, I hollered for [Bell] to hang on. And we had got slowed down enough to almost miss him, the brakes went off and came back on again, which caused my tire to hit the back of the trailer, which caused us to turn, and cause us to wreck.

Sumrell clarified that although he could not be sure there was contact between his motorcycle and the trailer, he "believe[d] that there actually was[,]" that he "remember[ed] a sudden thud, and hit, and then the bike went down."

¶ 9        Sumrell came to a stop on his stomach in the right lane of I-40. Although he was able to roll over to avoid getting hit by the semi that he had passed, he was not

able to get up due to his injuries. Sumrell had road rash on both arms, abrasions on his back, shoulder, foot, and knees, and one arm had flesh rubbed off of it almost to the bone. He had a broken wrist and toe. He had surgery on his hand, wrist, thumb, and finger, and the injuries required the insertion of a plate, pins, and screws. He was hospitalized for a week and attended physical therapy for two to three months thereafter. While in the trauma center, Sumrell was told that Bell had died in the crash. Sumrell was treated for mental health issues as result of the loss of his fiancée.

¶ 10    Alphin testified that he and Sumrell were driving their motorcycles in a staggered formation, meaning "the person in front of you is on the left. And the person in the back is on the right. You try to give about two to three seconds between each one, so that if something does happen, you have some time to react and you're not crowding." After passing the semi, Alphin told Sumrell to get over. He then told him to stop as the black car came up behind them, cut over to the right lane, and then passed them.

¶ 11    Alphin then saw Defendant "hanging outside the window, flipping me off, coming up at high rate of speed behind me." Defendant "cut me off between me and the eighteen-wheeler. I don't know how close he came to the eighteen-wheeler, but I think it was pretty close." When Defendant got beside Alphin, "he's got his head out the window, he's hollering at me, he's giving me the finger. I turned my radio wide open. I did not say anything to him at all. I just said, '[Sumrell], let this guy go on

by . . . he's crazy. Let him go.'" "When he got up beside [Sumrell] and [Bell], he poked his head out. He's got his hand out the window giving him the finger, hollering at him."

Alphin started moving over to the right lane when he saw Defendant's van and trailer "cut hard to the left." Alphin thought the trailer was going to hit Sumrell's motorcycle at that point because "it was that close." Then Defendant "hit the brakes." Alphin testified, "I was running about sixty-five, seventy. And I almost passed them -- . . . I came right up -- when he hit the brakes, I had to hit mine . . . and I saw the brake lights." When Defendant hit the brakes, Sumrell hit his brakes to keep from hitting the U-Haul trailer. Alphin saw Bell fly off the side of the motorcycle and Sumrell going down with the motorcycle.

When Alphin looked up after the crash, Defendant's "van had come to a slow speed. . . . All of a sudden, the van takes off at a high rate of speed." Alphin saw the semi and other cars stopping behind him, so he pursued Defendant to get his license plate number. Defendant continued on I-40 with Alphin following on his motorcycle. Defendant "was going in-and-out of traffic at high rates of speed. We got over a hundred miles an hour."

Once Alphin caught up to Defendant, Defendant "[l]ooks at me, he smiles, takes his hand off the wheel, he gives me the finger." Defendant then swerved his van and trailer into Alphin's lane twice. Alphin took out his pistol and shot

Defendant's tire to keep Defendant from swerving the van at him again.

¶ 15      Alphin called 911 and gave the license plate number of Defendant's van and trailer to the Highway Patrol. Alphin continued to follow Defendant onto I-77, intending to keep Defendant in sight until he was apprehended. But Alphin was advised by the highway patrol officer on the line to turn around and return to the scene of the accident, which he did.

¶ 16      At the time of the crash, Timothy Snook was driving west on I-40 behind the semi. He was about to pass the semi when the motorcycles driven by Sumrell and Alphin passed him in the left lane. He was again about to pass the semi when Defendant, in the white van with the trailer, passed on his left. Defendant's trailer was weaving badly. Snook described the trailer as "open" and not high enough to obstruct vision from the van. He initially stayed behind the semi for fear that he might be hit by the van's weaving trailer.

¶ 17      After passing Snook, Defendant's van also passed the semi and moved into the right lane in front of the semi. Snook then moved into the left lane directly behind the motorcycles to pass the semi. Snook saw that, as Defendant's van passed the motorcyclists on their right, Defendant leaned out of the driver's side window and made the rude gesture at the motorcyclists. In doing so, he stuck his entire arm out of the window. He also stuck his face out of the window and Snook could see his mouth moving, although he could not hear what Defendant was saying. The

motorcyclists did not gesture back at Defendant.

Snook saw Defendant's van suddenly swerve left in front of the motorcyclists and saw the van's brake lights come on. Snook saw smoke from the tires of Sumrell's motorcycle due to its brakes being applied. Snook testified that "[t]here was no distance" between Defendant's trailer and Sumrell's motorcycle, and that "[t]here was no choice for that motorcycle." Snook saw Sumrell and Bell go "flying and flipping," and land on the highway. Sumrell's motorcycle went flying in pieces off to the shoulder of the highway and up an embankment. Snook saw Defendant's van speed up, and Alphin's motorcycle giving chase

Dwayne Haskins was the driver of the semi. Haskins recalled the motorcycles and then the van and trailer passing him, and the motorcycle making contact with the van's trailer, causing both people on the motorcycle to fall onto the roadway. Electronic logs automatically recorded by his semi showed that at the time of the crash, Haskins applied his air brakes and stopped in seven seconds from a speed of 65 miles per hour. While he was braking, Haskins was able to pull his truck off the right edge of I-40 into the emergency lane to avoid hitting the motorcyclists lying in the roadway. The electronic logs showed that Haskins applied his air brakes at 3:57 pm EST.

After stopping his truck, Haskins approached both Sumrell and Bell. Sumrell was able to speak but Bell, who was bleeding from her nose and mouth, was non-

responsive. Her breathing was "raspy." Haskins, a former EMT, had someone call 911, and he monitored Bell's breathing until EMS arrived. Bell died within minutes of being taken to the emergency room. Haskins talked to the police officers at the scene and gave them a written statement which reflected that Sumrell's motorcycle and Defendant's trailer had made contact.

¶ 21 Records from Defendant's cellular telephone provider showed that at 3:58:38 p.m., a call was made from Defendant's phone to 911; the call lasted 8 seconds. Defendant's phone then made another call to another number that lasted 10 minutes. The 911 records show the operator answered the call from Defendant's phone and stayed on the line 54 seconds but received no information.

¶ 22 At 4:15 p.m., Defendant pulled into the Towlin Mill One Stop, located at the second exit on I-77 north of I-40. One Stop sells gasoline and groceries, has a restaurant, and rents U-Haul trailers. Defendant, his dog, the van, and the trailer appeared on a video camera at One Stop; the van clearly had a flat tire.

¶ 23 Rick Dowdle, a part-time contractor for U-Haul, was at One Stop when Defendant arrived. When Dowdle asked Defendant what had happened to the tire, Defendant replied that the tire had blown out on I-40. After being told that no one at One Stop could change his tire, Defendant called AAA.

¶ 24 Chris Pritchard, who worked for a towing company that contracts with AAA, was called to One Stop to change Defendant's tire. While talking with Defendant,

Defendant asked Pritchard how far it was to Stony Point, and how he could get there without going on the interstate highway.

After changing the tire, Pritchard called his wife and learned of the crash involving the motorcycle on I-40. After seeing a description of the van on social media, and believing he had just changed the tire of a vehicle involved in the fatal crash, Pritchard called law enforcement and provided them with the license tag number of the van. The investigating law enforcement officer got Defendant's name from AAA. Law enforcement was unable to locate Defendant at an address associated with his telephone number, although they found a box on the porch at that address that had been delivered with Defendant's name on it.

On 2 June 2017, law enforcement was contacted by Defendant's attorney. Upon speaking with the attorney, they were told that Defendant's van was at an address in Banner Elk. Officers went to that address and located the van, but not Defendant. Defendant turned himself in to law enforcement on 3 June. The U-Haul trailer had been returned to the U-Haul company.

### III. Discussion

**A. Sufficient Evidence**

Defendant first argues that the trial court erred by denying Defendant's motion to dismiss the two charges of felony hit and run, because the State failed to present substantial evidence that Defendant knew, or reasonably should have known,

a wreck happened and someone was killed or seriously injured. We disagree.

To survive a motion to dismiss for insufficient evidence, the State is required to present substantial evidence of "(1) each essential element of the offense charged, and (2) of defendant's being the perpetrator of the charged offense." *State v. Johnson*, 203 N.C. App. 718, 724, 693 S.E.2d 145, 148 (2010) (citation omitted). "Substantial evidence is the amount necessary to persuade a rational juror to accept a conclusion." *State v. Golder*, 374 N.C. 238, 249, 839 S.E.2d 782, 790 (2020) (quotation marks and citations omitted). In reviewing a trial court's denial of a motion to dismiss, we consider the evidence "in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Morgan*, 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004) (citation omitted). "If the evidence presented is circumstantial, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances." *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (quotation marks and citations omitted). "Circumstantial evidence may . . . support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988) (citation omitted). We review a trial court's denial of a motion to dismiss de novo. *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007).

Pursuant to N.C. Gen. Stat. § 20-166(a), "[t]he driver of any vehicle who knows or reasonably should know: (1) [t]hat the vehicle which he or she is operating is

involved in a crash; and (2) [t]hat the crash has resulted in serious bodily injury . . . or death to any person; shall immediately stop [their] vehicle at the scene of the crash" and "remain" until authorized to leave, with a willful violation of this requirement punishable as a Class F felony. N.C. Gen. Stat. § 20-166(a) (2019). "'Serious bodily injury' is defined as bodily injury that creates a substantial risk of death, or that causes serious permanent disfigurement, coma, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization." N.C. Gen. Stat. § 14-32.4 (2019).

¶ 30   The evidence presented at trial, although circumstantial, was sufficient to persuade a rational juror to accept a conclusion that Defendant knew, or reasonably should have known, that the vehicle he was driving was involved in a crash and that someone was killed or seriously injured as a result. Taken in the light most favorable to the State, the evidence tends to show the following: Defendant was driving a white van towing a U-Haul trailer that was "open" and not high enough to obstruct vision from the van. When Defendant passed Snook, Defendant's trailer was weaving badly so Snook stayed behind the semi because he feared he might be hit by Defendant's weaving trailer. Defendant moved into the right lane, squeezing between Alphin's rear tire and the front of the semi. When Defendant passed Alphin, Defendant made a rude gesture out the window as he went by. Similarly, when Defendant passed

Sumrell and Bell, Defendant was hanging out of his window, yelling and spitting at Sumrell and Bell, and making obscene gestures in their direction.

¶ 31     As Defendant pulled ahead of Sumrell and Bell, Defendant abruptly swerved into their lane, directly in front of Sumrell and Bell, and "slammed on his brakes." Sumrell "saw [Defendant] in the [driver's side] mirror" of the van, "looking in the mirror, looking at me laughing." Defendant's van and trailer quickly reduced speed directly in front of Sumrell and Bell, forcing Sumrell to apply his brakes so hard that the friction between the pavement and the rubber of the motorcycle's tires generated black smoke.

¶ 32     Sumrell was able to slow down almost enough to miss the trailer, but Defendant released the brakes and then hit them again. This caused Sumrell's tire to hit the back of the U-Haul or caused his motorcycle to lay down. During Sumrell's attempt to avoid the U-Haul, Bell was thrown from the back of the motorcycle, then Sumrell hit the pavement and slid across the interstate into the right lane. His motorcycle ended up on or beyond the shoulder of the right west-bound lane of I-40.

¶ 33     Immediately after the crash, Defendant's van slowed down. Then, all of a sudden, it took off at a high rate of speed. Approximately one minute after the crash, Defendant called 911 but then did not leave any information. Defendant continued on I-40, cutting in and out of traffic at speeds of up to and above 100 miles per hour, with Alphin following on his motorcycle. When Alphin caught up to Defendant,

Defendant again made a rude gesture at Alphin and swerved his van and trailer into Alphin's lane twice. Alphin took out his pistol and shot Defendant's tire to keep Defendant from swerving at him again. When Defendant exited the highway to get his tire fixed, he did not mention to either Dowdle or Pritchard how his tire became flat, and he asked Pritchard for directions to Stony Point without traveling on the highway.

¶ 34 From this evidence the jury could reasonably infer the following: Defendant intentionally swerved his van and trailer directly in front of Sumrell and Bell, while they were on a motorcycle traveling at a speed of 70 miles per hour on the highway; Defendant intentionally "slammed" on his brakes, released them, and then hit them a second time; Defendant was able to maneuver in and out of traffic and, thus, knew where his van and trailer were positioned relative to other vehicles on the road, including Sumrell's motorcycle and Haskin's semi; Defendant was able to see what was going on behind his van and trailer; Defendant caused Sumrell to brake hard to try and avoid the U-Haul; Defendant caused Sumrell's motorcycle to hit the U-Haul or lose control because of the sudden need to brake; Sumrell and Bell flew off the motorcycle and onto the highway in 70-mile-per-hour traffic; Sumrell sustained serious injuries requiring hospitalization, surgery, and continued therapy as a result of the crash; Bell died from injuries sustained as a result of the crash; Defendant slowed down immediately after the crash because he was aware the crash occurred;

Defendant then suddenly sped away from the scene of the crash, weaving in and out of traffic at speeds up to and over 100 miles per hour, to avoid getting caught; and Defendant continued to try and avoid detection by not disclosing the cause of his flat tire and trying to avoid going back on the highway. The evidence was sufficient to persuade a rational juror to accept a conclusion that Defendant knew, or reasonably should have known, that the vehicle he was driving was involved in a crash and that someone was killed or seriously injured as a result.

¶ 35        Defendant's challenge to the sufficiency of the evidence essentially rests upon his contention that the evidence could have shown that Defendant could not have seen behind his van and trailer or that there may not have been contact between Sumrell's motorcycle and Defendant's trailer. Thus, Defendant argues, there was insufficient evidence that Defendant knew or reasonably should have known that the vehicle he was operating was involved in a crash or that the crash has resulted in serious bodily injury.

¶ 36        As Defendant acknowledges, however, contact is not required by our statutes in order for an accident to occur. *See* N.C. Gen. Stat. § 20-4.01 (4c) (2019) (A "crash" is defined as "[a]ny event that results in injury or property damage attributable directly to the motion of a motor vehicle or its load. The terms collision, accident, and crash and their cognates are synonymous.") Moreover, it is well settled that the weight and credibility to be afforded the evidence is a matter for determination by

the jury rather than a reviewing court. *State v. Moses*, 350 N.C. 741, 767, 517 S.E.2d 853, 869 (1999). Furthermore, even if Defendant could not have seen behind the trailer and even if there was no contact between the motorcycle's front tire and the U-Haul, the circumstantial evidence was nonetheless sufficient to persuade a rational juror to accept a conclusion that Defendant knew, or reasonably should have known, that the vehicle he was driving was involved in a crash and that someone was killed or seriously injured as a result. Defendant's challenge to the sufficiency of the evidence to support his conviction lacks merit. Accordingly, the trial court did not err by denying Defendant's motion to dismiss the charges.

## B. Jury Instruction

Defendant next argues that the trial court erred by giving the following jury instruction on flight, in accordance with N.C.P.I.—Crim. 104.35:

> The State contends (and the defendant denies) that the defendant fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of the circumstance is not sufficient, in itself, to establish defendant's guilt.

Defendant argues that allowing the jury to consider flight as evidence of Defendant's consciousness of guilt is inappropriate in the context of a hit and run charge under N.C. Gen. Stat. § 20-166(a), because "leaving the scene of the offense, which could be considered flight under the challenged instruction, is an essential element of felony

hit and run."

¶ 38    We review the trial court's decision to instruct a jury on flight de novo. *State v. Davis*, 226 N.C. App. 96, 98, 738 S.E.2d 417, 419 (2013).

¶ 39    "[A]n instruction on flight is justified if there is some evidence in the record reasonably supporting the theory that the defendant fled after the commission of the crime charged." *State v. Blakeney*, 352 N.C. 287, 314, 531 S.E.2d 799, 819 (2000) (quotation marks and citations omitted). "Flight is defined as leaving the scene of the crime and taking steps to avoid apprehension." *State v. Bagley*, 183 N.C. App. 514, 520, 644 S.E.2d 615, 620 (2007) (quotation marks and citation omitted). Accordingly, "[m]ere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." *State v. Thompson*, 328 N.C. 477, 490, 402 S.E.2d 386, 392 (1991) (citation omitted). Furthermore, "an action that was not part of [a d]efendant's normal pattern of behavior . . . could be viewed as a step to avoid apprehension." *State v. Hope*, 189 N.C. App. 309, 319, 657 S.E.2d 909, 915 (2008) (quotation marks and citation omitted).

¶ 40    First, we disagree with Defendant's assertion that flight is an essential element of felony hit and run under N.C. Gen. Stat. § 20-166(a). According to section 20-166(a), "[t]he driver of any vehicle who knows or reasonably should know: (1) [t]hat the vehicle which he or she is operating is involved in a crash; and (2) [t]hat the crash

has resulted in serious bodily injury . . . or death to any person; shall immediately stop his or her vehicle at the scene of the crash" and "remain" until authorized to leave, with a willful violation of this requirement punishable as a Class F felony. N.C. Gen. Stat. § 20-166(a). Accordingly, to establish this offense, the State must show the following: (1) Defendant was driving a vehicle; (2) Defendant knew or reasonably should have known that the vehicle was involved in a crash; (3) Defendant knew or reasonably should have known that the crash resulted in serious bodily injury to or the death of another; (4) Defendant did not immediately stop his vehicle at the scene of the crash; and (5) Defendant's failure to stop was willful. *Id.* In contrast to "flight" in the legal sense, the driver's motive for failing to immediately stop at the crash scene is immaterial. Indeed, a hit and run occurs even if the departing driver is completely without fault in the collision and not subject to "apprehension." *See State v. Smith*, 264 N.C. 575, 577, 142 S.E.2d 149, 151 (1965) ("Absence of fault on the part of the driver is not a defense to the charge of failure to stop."). As to this point of law, Defendant's argument is overruled.

¶ 41        Next, to the extent that Defendant argues that the evidence did not support a flight instruction, we also disagree. Immediately after the crash, Defendant slowed down momentarily and then sped up. He sped away from the crash at over 100 miles per hour, weaving in and out of traffic. Although he dialed 911 and remained on the line for 8 seconds, he failed to speak to the 911 operator. While attempting to get his

tire fixed, he avoided a direct question about what had happened to his tire by stating only that it had blown out on I-40. He then asked for directions to Stony Point that did not require traveling on the interstate highway. These facts constitute sufficient "steps to avoid apprehension" to support an instruction on flight. *Cf. State v. Harvell*, 236 N.C. App. 404, 412, 762 S.E.2d 659, 664-65 (2014) (discerning no error in giving flight instruction where the defendant ran from the house he had broken into and was discovered fifteen minutes later on a nearby "dirt road that was . . . 'not a road that people use for traffic'"). Defendant's conduct went well beyond a mere "fail[ure] to immediately stop at the scene of the crash," as required for the offense of hit and run. *Braswell*, 222 N.C. App. at 182, 729 S.E.2d at 702. Accordingly, the trial court did not err by instructing the jury on flight.

## IV. Conclusion

¶ 42      The trial court did not err by denying Defendant's motion to dismiss the charges of felony hit and run as the State presented sufficient evidence that Defendant knew, or reasonably should have known, that the vehicle he was driving was involved in a crash and that someone was killed or seriously injured as a result. The trial court did not err by instructing the jury on flight as flight is not an essential element of felony hit and run and the evidence supported a flight instruction.

NO ERROR.

Judges INMAN and GRIFFIN concur.